**Ella MILNARIK et al., Plaintiffs-Appellants,**

v.

**M-S COMMODITIES, INC., an Illinois corporation, and David S. Nelson, Defendants-Appellees.**

**No. 18972.**

United States Court of Appeals, Seventh Circuit.

Jan. 28, 1972.

Rehearing Denied March 13, 1972.

Walter H. Moses, Jr., James L. Fox, Chicago, Ill., for plaintiffs-appellants.

Arthur M. Mintz, Irving Lewis, Chicago, Ill., for defendants-appellees.

Before DUFFY, Senior Circuit Judge, and KERNER* and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

This appeal challenges the district court's holding that a discretionary trading account in commodity futures is not subject to the registration requirements of § 5 of the Securities Act of 1933, 15 U.S.C. § 77e.

Plaintiffs deposited $13,662 with defendant Nelson on the understanding that he could use those funds at his discretion to trade commodity futures for the benefit of plaintiffs. Nelson made various trades on margin, resulting in a net loss greater than the amount deposited and, accordingly, made demand on plaintiffs for an additional $7,428. Plaintiffs then sought to rescind the discretionary trading account and to recover their deposit, plus interest, on the theory that their agreement with Nelson —rather than the futures contracts he had been authorized to buy and sell—

was a "security" which should have been registered pursuant to 15 U.S.C. § 77e.[1]

The complaint was dismissed by the district court, 320 F.Supp. 1149 (N.D.Ill. 1970), on the ground that the agreement between plaintiffs and Nelson resulted from a private rather than a public offering and, therefore, was not required to be registered even if it was a "security" within the § 77b definition.[2] Since we are persuaded that a discretionary trading account is not a security, we agree that registration was not required.

The investment contract purchased from Nelson is described in the complaint as an agreement "that Nelson should use said funds at Nelson's discretion to trade commodity futures for Milnarik's benefit and profit." It is further alleged that all trades were to be made by Nelson at the sole risk of plaintiffs and that Nelson's sole compensation would be derived from commissions generated by his trading. Nelson, and his co-defendant principal, allegedly entered into similar discretionary contracts with numerous other customers.

Plaintiffs' position that the language of the complaint describes an investment contract covered by the Act is supported by two district court decisions[3] and by a literal interpretation of the statutory words. Nevertheless, we do not believe every conceivable arrangement that would fit a dictionary defini-

---

* Judge Kerner heard oral argument but did not participate in the adoption of this opinion.

1. Futures contracts themselves are not securities and need not be registered under the Securities Act of 1933. See Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 253 F.Supp. 359, 365-367 (S.D.N.Y.1966). They may, of course, be regulated under other statutes. See Commodity Exchange Act, 7 U.S.C. § 1 et seq.

2. "When used in this subchapter, unless the context otherwise requires—
   "(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in

any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 15 U.S.C. § 77b.

3. Maheu v. Reynolds Co., 282 F.Supp. 423 (S.D.N.Y.1968); Berman v. Orimex Trading, Inc., 291 F.Supp. 701 (S.D. N.Y.1968).

tion of an investment contract was intended to be included within the statutory definition of a security. We are "reminded that, in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564.

■ Judicial analyses of the question whether particular investment contracts are "securities" within the statutory definition have repeatedly stressed the significance of finding a common enterprise. Thus, in *Tcherepnin,* which arose under the Securities Exchange Act of 1934,[4] the Court held that withdrawable shares in a savings and loan association met the test which had been stated in S. E. C. v. W. J. Howey Co., 328 U.S. 293 at 301, 66 S.Ct. 1100, 90 L.Ed. 1244, and in explaining its holding said:

"Of the several types of instruments designated as securities by § 3(a)(10) of the 1934 Act, the petitioners' shares most closely resemble investment contracts. 'The test [for an investment contract] is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' [S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244] at 301 [66 S.Ct. at 1104]. Petitioners are participants in a common enterprise—a money-lending operation dependent for its success upon the skill and efforts of the management of City Savings in making sound loans. Because Illinois law ties the payment of dividends on withdrawable capital shares to an apportionment of profits, the petitioners can expect a return on their investment only if City Savings shows a profit." Tcherepnin v. Knight, 389 U.S. at 338–339, 88 S.Ct. at 554.

We applied the test as quoted from the opinion in *Howey* in our recent opinion in Kemmerer v. Weaver, 7 Cir.,

445 F.2d 76, 79 (1971). We there followed the Tenth Circuit opinion in Continental Marketing Corporation v. S. E. C., 387 F.2d 466 (1967). Excerpts from that opinion plainly identify the common enterprise as an important aspect of the court's analysis:

"The district court concluded that Continental was engaged in a common enterprise, the very heart of which was a chance to invest money through multiple contracts amounting in reality to an 'investment contract' within the meaning of the applicable statute. The subject injunction is so founded and we hold it to be legally sound.

\*　\*　\*　\*　\*　\*

"Investment by members of the public was a profit-making venture in a common enterprise, the success of which was inescapably tied to the efforts of the ranchers and the other defendants and not to the efforts of the investors.

\*　\*　\*　\*　\*　\*

"This structure into which investors entered was designed to obtain sufficient resources to produce enough domestic beavers to establish a market for its fur. If the structure collapsed then the purchasers would have little more than a bad investment. Certainly the beavers as mere animals and not as part of the enterprise did not have value consistent with the price many of the purchasers paid. The economic inducement was the faith or hope in the success of the enterprise—the domestic beaver industry—as a whole, and not the value of the animals alone." Continental Marketing Corp. v. S. E. C., 387 F.2d at 469, 470, 471.

We find the element of commonality absent here. Although the complaint does allege that Nelson entered into similar discretionary arrangements with other customers, the success or failure of those other contracts had no direct impact on the profitability of plaintiffs' contract. Nelson's various customers

---

4. 48 Stat. 881, 15 U.S.C. § 78a et seq.

were represented by a common agent, but they were not joint participants in the same investment enterprise.

Although the district court's holding rests on a ground that we do not reach, many of his well-reasoned observations support our conclusion that the 1933 Act was not intended to have the effect claimed by plaintiffs here. We, therefore, quote with approval the following portions of his opinion [5]:

"The nature of a discretionary trading account makes apparent the inapplicability of the criteria generally applied by courts in determining whether or not a securities offering is public. The reported decisions deal almost exclusively with sales of stock or other fractional interests in commercial ventures, even if cloaked in the guise of sales of property, where the criteria for determining whether the offering was public or private in nature have included 1) the number of shares in the offering, 2) their respective amounts, and 3) the manner of offering, as well as the more general determination of whether the persons affected stand in need of the protection and knowledge that would be gained if the offering had been properly registered. In the instant case the 'security' with which we are dealing is the 'investment contract' between the plaintiffs and Nelson creating the discretionary trading account. The 'security' has not been, as in the more typical situation, issued by the defendant and sold to the plaintiff. Rather, the security as we are here defining it, is an oral agency agreement in which the theoretical 'seller' becomes the agent of the 'buyer.' It is arguable that no transaction whatsoever has occurred solely as a result of the crea-

tion of the discretionary account since no interest of any kind has been 'transferred' or 'sold' to the 'buyer.' All that has happened is that the so-called 'buyer' has transferred funds to the so-called 'seller' and given him discretionary authority to enter into future transactions on the 'buyer's' behalf.

"In essence, this contract creates an agency-for-hire rather than constituting the sale of a unit of a larger enterprise. No matter how many different persons Nelson became an agent for under similar or even identical discretionary contracts, his relationship with each would remain as that of agent and principal. Each contract creating this relationship is unitary in nature and each will be a success or failure without regard to the others. Some may show a profit, some a loss, but they are independent of each other. No matter how many discretionary trading accounts Nelson may have had with other principals, the 'security' 'issued' to the plaintiffs, their discretionary trading account, could not be offered to anyone else. Although this Court recognizes that the registration requirements of Section 5 are for the protection of the public and that any exemption therefrom must be strictly construed against one claiming it, Securities and Exchange Commission v. Ralston Purina Co., [346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494]; Securities and Exchange Commission v. Culpepper, 270 F.2d 241 (2d Cir. 1959), the unitary nature of the contract here involved is not overcome even when the transaction is viewed most strongly against the defendants.

"In an effort to avoid the necessary implications of the above facts, plain-

---

5. Milnarik v. M-S Commodities, Inc., 320 F.Supp. 1149, 1151–1152, 1153 (N.D.Ill. 1970). In the quoted excerpts we omit the district court's footnotes. Our omission of the portions of the district court's opinion discussing the plaintiffs' argument that registration of discretionary trading accounts would effectuate the policy of the statute is not intended to express either agreement or disagreement with those views; we simply find it unnecessary to comment on any question of policy in order to dispose of this appeal.

tiffs attempt to analogize from the many court decisions wherein single sales of property or animals to many individuals were held to be investment contracts between each individual purchaser and the common seller and thus held to be securities. The plaintiffs claim that the many individual sales of property by one seller in those cases were grouped together to reveal the public nature of the offerings; they claim that Nelson's contracting individually with many people should be viewed as a whole and thus the public nature of his offering should likewise become apparent.

\*　　\*　　\*　　\*　　\*　　\*

"The courts, in substance, found these schemes to be attempts by promoters or entrepreneurs to create a pool of capital to be used in furthering a common enterprise by dividing up the needed base into units for individual sales. These plans, in other words, were all sales of units of a common enterprise no different in operating reality from the sale of stock by a corporation, only disguised under a veneer of property-sale terminology. Thus, although the sales of units of land in the citrus grove plus operational contracts involved in *Howey*, *supra* note 4, purported to be outright sales from one individual to another (and thus no different than the situation here involved), the Supreme Court specifically found that the transfers involved much more than fee simple interest in land. Rather, the Court found a scheme whereby all the individuals 'purchasing' the land in fact were contributing money to a common enterprise and were expecting to claim their respective profits from

the operations of the entire citrus grove; the resulting transfer of rights in land was considered to be purely technical. 328 U.S. 293, 299–300 [66 S.Ct. 1100, 90 L.Ed. 1244].

"This characteristic of common enterprise is completely lacking in the present case. Even assuming that Nelson in fact solicited and collected money from numerous parties, no allegations are made that a common enterprise existed comprised of all people possessing discretionary account contracts with him. No claim is made that Nelson traded in a uniform manner for each of these accounts. Even if he had so uniformly traded, no pooling of funds for a common purpose is alleged. Nelson was apparently simply an agent for a number of separate and distinct principals, the plaintiffs being one such principal. The plaintiffs in no way can be viewed as having invested in a common enterprise with other suppliers of venture capital. Without such common investment, the property sale cases are not analogous.

\*　　\*　　\*　　\*　　\*　　\*

"It should be noted that the Securities and Exchange Commission apparently is of the same opinion, *i. e.*, that no public offering is involved in the creation of a discretionary brokerage account whether in securities or commodities since, we are advised, it has never proceeded against any broker or dealer soliciting and accepting such accounts solely for failure to register under the Securities Act of 1933, even though such discretionary accounts have been in widespread use during the 37 years since the Act's enactment." [6]

6. A portion of the district court's footnote at this point reads as follows:
"The requisite factual listings needed in a registration statement for a discretionary account would be difficult to define and the Commission would find it equally arduous to enforce accurate registration. The administration of any

such registration requirements would be at least as difficult to enforce over discretionary trading accounts as it would be over such other atypical types of securities as puts and calls, which the Commission has also never required to be registered under Section 5 precisely because of these practical difficulties of

Plaintiffs have pointed out that the stipulation of facts in the *Howey* case made it clear that each investor received a separate accounting with respect to the specific property which he owned, see 151 F.2d at 716, and that in *Kemmerer* the investors purchased specific beavers and relied on the defendant's expertise much as plaintiffs here relied on Nelson. But the individual aspects of the investments in those cases did not obscure the economic reality of participation in a common enterprise.[7]

We do not believe an investor who grants discretionary authority to his broker thereby joins the broker's other customers in the kind of common enterprise that would convert the agency relationship into a statutory security.

The judgment is affirmed.

administration. See, generally, 1 Loss, Securities Regulation, pp. 467–469 (2d ed. 1961)." 320 F.Supp. at 1154, n. 7. The plaintiffs have called our attention to an unreported case, S.E.C. v. Commodity Brokerage Co., Inc. (Civil 67–105, W. D.Pa.1967) in which the S.E.C. did file a complaint against a brokerage company engaging in certain types of commodity futures transactions ("investment contracts and participation in profit sharing agreements involving purchases, sales and resales of commodity futures in managed accounts with commingled funds solicited from investors"). However, that case was settled by entry of a consent decree, apparently before any evidentiary hearing was had on the exact nature of the alleged violations. We do not think that this single case, settled by consent decree, substantially undercuts the point made by the district court. It is not clear that the present case is exactly the same as the Pennsylvania case, especially in view of the repeated references to "commingled funds" in the complaint in the Pennsylvania case. No such specific allegations have been made here.

7. In *Howey* the Supreme Court noted that the individual investor had no right to specific fruit:

"Without the consent of the company, the land owner or purchaser has no right of entry to market the crop; thus there is ordinarily no right to specific

fruit. The company is accountable only for an allocation of the net profits based upon a check made at the time of picking. All the produce is pooled by the respondent companies, which do business under their own names." 328 U.S. at 296, 66 S.Ct. at 1102.

Later the Court again identified its estimate of the relative importance of the separate as opposed to the common elements of the enterprise:

"A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments. Their respective shares in this enterprise are evidenced by land sales contracts and warranty deeds, which serve as a convenient method of determining the investors' allocable shares of the profits. The resulting transfer of rights in land is purely incidental.

"Thus all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed." 328 U.S. at 300, 66 S.Ct. at 1103.