Lawrence BERMAN, Plaintiff,

v.

BACHE, HALSEY, STUART, SHIELDS, INC., Defendant.

No. C–2–77–723.

United States District Court, S. D. Ohio, E. D.

Feb. 2, 1979.

William B. Logan, Jr., Zacks, Luper & Wolinetz, Robert C. Perrin, Columbus, Ohio, for plaintiff.

Richard C. Graham, Sol Morton Isaac, Isaac, Graham & Nester, Columbus, Ohio, for defendant.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on the motion of the defendant to dismiss and the motion of the defendant to stay the action pending arbitration.

### I

On September 16, 1977, the plaintiff, Lawrence Berman, filed a complaint against the defendant, Bache, Halsey, Stuart, Shields, Inc., alleging causes of action based upon the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, the Commodity Exchange Act of 1936, 7 U.S.C. § 1 *et seq.*, and the common law of the State of Ohio. The complaint alleged that the plaintiff executed a customer margin and lending agreement with the defendant in 1960. The plaintiff's account was largely unused until he approached the defendant in late 1972 and then began trading in stocks, commodities and metals through the defendant's since deceased employee, one Ned Grandstaff. The transactions which comprise the subject matter of this complaint took place between January 8, 1973 and August 8, 1974.

The defendant subsequently moved this Court to dismiss all nine counts of the original complaint or to stay the action pending arbitration which was provided for in the margin agreement between the parties. The plaintiff not only filed memoranda in opposition to these motions, but also sought leave to file a second amended complaint purporting to set out in greater factual detail the basis of the allegations of fraud originally pleaded. Leave to file the second amended complaint was granted by this Court in an order dated February 8, 1978.

In addition to the pleadings, both parties have filed affidavits with respect to the motion to dismiss. The defendant has offered the statement of two surviving account representatives who either worked on the plaintiff's account or observed the relationship between the plaintiff and Mr. Grandstaff. Both affidavits indicate that the plaintiff made numerous and daily visits to the offices of the defendant and approved or was informed of all of the investments made on his behalf; in the opinion of both affiants, the plaintiff was a "sophisticated" investor. The plaintiff's affidavit denies any investment expertise on his part, and states that, although his visits to the defendant's office were frequent, Mr. Grandstaff had actual discretion and in-fact control over the plaintiff's investment decisions.

The plaintiff's affidavit further describes his late 1972 meeting with Mr. Grandstaff at which time he orally communicated his "investment objectives," which were

   (a) to earn enough to pay the large capital gains;

   (b) to take no undue risk which would dissipate my capital;

   (c) to take no large loss in any single transaction;

   (d) not to invest in any commodities, because there would be less chance of erosion of my capital with stocks;

   (e) to have someone to advise me who was an expert and who was familiar with my stated objectives and to do whatever that expert told me to do.

The plaintiff's affidavit also contains the following statement:

7. Sometime during 1973, and I believe it was April or May, Mr. Grandstaff strongly suggested that I invest in commodities futures contracts. I informed him that I had no interest in that type of investment, because of the high risk of loss of principle [sic].

8. After much discussion, I reluctantly agreed to enter that market. Mr. Grandstaff had told me that he was accustomed to guiding investors in that market and that he would take care of me.

### II

In considering the complaint as originally filed and the various memoranda and affidavits, it is apparent that the crux of the plaintiff's complaint against the defendant

is the trading in commodities futures contracts in corn, wheat, soybeans, soybean meal and palladium. In light of the defendant's argument that such commodities futures contracts are not "securities" within the meaning of the Securities Act of 1933 or the Securities Exchange Act of 1934, the plaintiff's second amended complaint lists, under "The Facts and Circumstances" a number of transactions in stocks which, it is stated, are also "complained of."

The addition of these transactions in what are concededly securities evidently has a two-fold purpose. The first is to establish the jurisdiction of this Court directly under the 1933 and 1934 Acts with respect to the alleged fraud of the defendants in these transactions involving securities. The second is to establish the jurisdiction of this Court under the 1933 and 1934 Acts with respect to the allegedly fraudulent commodities futures transactions by alleging a general scheme to defraud the plaintiff through the trading of both securities and commodities. *See Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1210 (CA 9, 1970) *affirming* 283 F.Supp. 417 (N.D.Calif.1968). This second theory of jurisdiction under the securities laws will be treated further below. The Court will now consider each count of the second amended complaint seriatim.

### Count One

█ Count 1 deals solely with the actions of the defendant "in connection with the sales and purchases by plaintiff of securities traded over national stock exchanges." Complaint, ¶ 9. This count, then, relates only to transactions in securities admittedly covered by the 1933 and 1934 Acts. The factual basis for the alleged fraud in these transactions is set out in paragraph 10(a). After stating that plaintiff had little investment expertise and that the defendant did have such expertise, the complaint alleges that

> [d]efendant, however, knew that its guidance did not fit within the parameters [sic] of Plaintiff's stated investment objectives, and Defendant was aware that

Plaintiff was relying on the guidance supplied by Defendant. Defendant intentionally, or with such recklessness as to indicate an intention, guided Plaintiff to follow a course of action which was, in fact, inconsistent with that desired by Plaintiff.

Defendant objects to Count 1 on the basis that plaintiff has not alleged fraud with the specificity required by Rule 9(b), Federal Rules of Civil Procedure. This Court agrees.

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Three reasons are usually assigned as the chief concerns underlying this rule. The first is to deter the filing of complaints in order to discover unknown wrongs; the second is to protect potential defendants from reputational damage due to the serious nature of a charge of fraud; the third is to provide the defendants with concrete notice of the particular conduct for which a defense must be prepared. *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1087 (S.D.N.Y., 1977). In Count 1 of this complaint the plaintiff does not provide sufficient particularity to alleviate any of these concerns.

Nowhere in Count 1 is it alleged that the defendant made any material misrepresentation, either affirmatively or by omission, which misled the plaintiff to his detriment. If these elements of securities fraud are intended to be gleaned from the allegation that the defendant did not follow the investment objectives of the plaintiff, the complaint does not state what those objectives were or in what way the defendant violated them. Nor does Count 1 specify which of the securities transactions which are generally said to be "complained of" earlier in the complaint did not comport with the plaintiff's investment objectives. Were the Court to read the affidavit submitted by the plaintiff with the memorandum contra the motion to dismiss as a part of the complaint, the plaintiff would not be

benefitted. The investment objectives listed in the affidavit make it difficult to imagine how those objectives could have been violated by the transactions described in Count 1. The Court need not speculate as to what constituted this fraud, nor attempt to imagine a set of facts by which the plaintiff could prevail. The standard here is Rule 9(b), not *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

In sum, this complaint falls far short of the specificity required in such cases as *Segal v. Gordon*, 467 F.2d 602, 608 (CA 2, 1972), *Rich v. Touche Ross & Co.*, 68 F.R.D. 243 (S.D.N.Y., 1975), and *Gross v. Diversified Mortgage Investors, supra*, 431 F.Supp. at 1087. In a factually similar case, Judge Knapp of the Southern District of New York held that when "[s]tripped of its conclusory allegations of fraud, the complaint alleges no more than that defendants negligently managed plaintiff's portfolio in connection with advising her on investment decisions," no cause of action can be stated under Rule 10b–5. *Carroll v. Bear, Stearns & Co.*, 416 F.Supp. 998, 1000 (S.D.N.Y.1976). Although that Court's insistence that facts comprising scienter must be alleged after the Supreme Court decision in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), appears to conflict with the second sentence of Rule 9(b), F.R.C.P., the Court also assigned the failure to allege the circumstances of the fraud with particularity as an alternate basis for dismissal, 416 F.Supp. at 1000 n. 1.

■ Judge Knapp's opinion in the *Carroll* case also makes the following observation with respect to an allegation of "churning:"[1]

Moreover, . . . a conclusory allegation of churning—without a factual support—cannot save this complaint. At most, the allegations in plaintiff's complaint demonstrate that defendants turned over the bulk of her account once in a 15 month period by selling 22 of 24 holdings and reinvesting the proceeds in nine other securities, earning as commissions a total of $9,000—or a sum equal to 1% of the portfolio value. This hardly constitutes illegal churning cognizable under 10b–5, as defined by the courts and commentators. *Fey v. Walston & Co., Inc.* (4th Cir. 1974) 493 F.2d 1036 (account turned over 13 times in 26 months); *Hecht v. Harris, Upham & Co.* (9th Cir. 1970) 430 F.2d 1202 (10,000 trades with a gross dollar volume of $100 million consummated for an account worth $533,000, the broker realizing $189,000 in commissions); *Moscarelli v. Stamm* (S.D.N.Y. 1968) 288 F.Supp. 453 (account turned over 12 times each month for 4 months; one particular security was purchased 15 times and sold 12); . . . Churning has also been defined as . . . transactions in his customer's account "which are excessive in size and frequency in light of the character of the account." . . . Certainly the single turn-over of plaintiff's account over a 15 month period and the earning of brokerage commissions equal to 1% in value of the account cannot be termed excessive or be classified as churning, as above defined. *See Marcus v. Putnam* (D.Mass.1973) 60 F.R.D. 441, 446.

416 F.Supp. at 1001. Because churning is a form of fraud, the particularity requirement of Rule 9(b) applies. Yet, in the instant case, Count 1 of the second amended complaint fails even to allege that the trading in the plaintiff's account was excessive. The entire allegation in Count 1 which the

---

1. The SEC has defined churning in the regulations under 15 U.S.C. § 78*o*:

   The term "manipulative, deceptive, or other fraudulent device or contrivance," as used in section 15(c) of the Act, is hereby defined to include any act of any broker, dealer or municipal securities dealer designed to effect with or for any customer's account in respect to which such broker, dealer or municipal securities dealer or his agent or employee is vested with any discretionary power any transactions of purchase or sale which are excessive in size or frequency in view of the financial resources and character of such account.

   17 C.F.R. § 240.15c 1–7(a). *See* Note, *Churning by Securities Dealers*, 80 Harv.L.Rev. 869 (1967).

plaintiff now maintains states a cause of action for churning is that "Defendant intentionally . . . directed Plaintiff to trade in stocks in such a manner as to benefit Defendant through obtaining greater commissions." Complaint, ¶ 10(b).

Because the plaintiff has been given ample opportunity to amend the complaint and still has failed to allege any underlying fact as to the size or frequency of the transactions which would support a claim of churning,[2] the Court can only conclude that the evils sought to be avoided by Rule 9(b) are present in the instant case. Thus, the claim made in paragraph 10(b), as with the remainder of Count 1, must be dismissed for failure to comply with Rule 9(b), F.R.C.P. Plaintiff has failed to plead facts sufficient to show that defendant engaged in any fraud "in connection with the sales and purchases by Plaintiff of securities traded over national stock exchanges . . . ."

### Count Two

The plaintiff's claims in Count 2 of the second amended complaint allege fraud in transactions for commodities futures contracts which were undertaken by the defendant on the plaintiff's behalf.[3] The fraud alleged in this count is again based upon the plaintiff's investment "objectives." Paragraph 12(c) states that

Defendant intentionally, or with such recklessness as to indicate an intention, guided Plaintiff to follow a course of action which should not have been entered into by an investor without adequate capital to survive substantial losses, which subjected Plaintiff to financial risks which had not been fully and totally explained to Plaintiff.

Complaint, ¶ 12(c). Paragraph 12(d) then alleges, in language almost identical to that of paragraph 10(b) in Count 1, that the defendant was guilty of churning the plaintiff's account with regard to commodities futures contracts.

The defendant again objects to this count on the basis of Rule 9(b), F.R.C.P., due to the failure to identify particular transactions by date or amount, to specify the way in which "objectives" were violated, and to indicate the size and frequency of transactions made for the purpose of churning. Defendant has also argued that Count 2 fails to state a claim under the Securities Act of 1933 and the Securities Exchange Act of 1934 because commodities futures contracts are not "securities" within the meaning of those Acts. The Court must therefore initially determine whether fraud in the trading of the commodities futures contracts involved in this litigation states a claim under the federal securities laws cognizable in the district court.

### A

Initially, it seems odd to question the applicability of the liberally construed federal securities laws to commodities futures contracts which are bought and sold on national exchanges, often by the same brokers who deal in corporate stock and other securities. An understanding of the

---

2. The Court recognizes that in some cases involving discretionary trading accounts, the facts necessary to allege a churning violation would be peculiarly in the possession of the defendant and it would be necessary to relax somewhat the requirement of Rule 9(b). No such special situation is urged in this case. Even if it were, however, relaxation would not mean eradication; plaintiff would have to provide *some* fact to indicate that the size or frequency of the transactions were excessive. Even that was not done in this case.

3. Count 2 incorporates by reference all of the preceding paragraphs of the complaint, including those of Count 1. The plaintiff argues that there was a general scheme engaged in by the defendant in which trading in securities and commodities futures were inextricably intertwined. The Court has already determined, however, that the complaint fails to allege any fraud with regard to the trading of stocks in Count 1. The simple incorporation of Count 1 adds no fact which would indicate in what way these two types of transactions were intertwined. Thus the plaintiff's attempt to plead a combined commodities/securities scheme which, if fraudulent, would be cognizable under the 1933 and 1934 Acts, *see Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1210 (CA 9, 1970), must also fail because it is necessarily based on the insufficient allegations of Count 1.

true nature of a commodities futures contract, however, demonstrates why virtually all courts agree that the simple commodities futures contract is not a "security." [4] *E. g. SEC v. Continental Commodities Corporation*, 497 F.2d 516, 520 n. 9 (CA 5, 1974); *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 275 n. 1 (CA 7, 1972); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F.Supp. 359 (S.D.N.Y.1966). A commodities futures contract is little more than a wager that the market price of a given commodity will change in a given direction by a specified future date. The parties to a commodities futures contract enter into an agreement whereby

> the purchaser agrees to take delivery, or the seller agrees to make delivery, of a specified quantity of a specified commodity at a specified future time at a specified price. . . . [the purchaser] is in no way investing his money in a common enterprise, nor is he led to expect profits solely from the efforts of any third party. The "enterprise" is an individual one. The expectation of profit arises solely from the speculative hope that the market price of the underlying commodity will vary in his favor, permitting purchase or sale at a profit.

*McCurnin v. Kohlmeyer & Co.*, 340 F.Supp. 1338, 1341 (E.D.La.1972), *affirmed*, 477 F.2d 113 (CA 5, 1973). *See generally, A. Alchien & W. Allen, Exchange and Production: Competition, Coordination and Control*, 131 (2d Ed. 1977).

The plaintiff argues that even if a commodities futures contract itself is not a security, the margin account, that is, the agreement by which the defendant would purchase such futures contracts on the plaintiff's behalf, was nonetheless a security. Again, research discloses general agreement that a nondiscretionary trading account used to purchase commodities futures contracts is not a security. *E. g., Consolo v. Hornblower & Weeks-Hemphill,*

*Noyes, Inc.*, 436 F.Supp. 447 (N.D.Ohio 1976). Some courts, however, have found that a *discretionary* account, whereby the broker has complete control over the investment decisions, is a security for purposes of the 1933 and 1934 securities laws, *SEC v. Continental Commodities Corporation*, 497 F.2d 516 (CA 5, 1974); other courts have rejected the same argument, *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274 (CA 7, 1972). Although the plaintiff's account was nominally nondiscretionary, the plaintiff has alleged that in actuality the defendant had such influence over the plaintiff's investment decisions as to have complete control over the account. For purposes of the motion to dismiss, these allegations must be accepted as true. Therefore, the Court is left with the question of whether a discretionary trading account for commodities futures is an "investment contract" and therefore a security.

In the landmark decision of *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court took note of the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," *id.* at 299, 66 S.Ct. at 1103, and provided a definition of an "investment contract" which is still the primary analytical tool employed by federal courts in determining whether a given commercial transaction involves a security. The *Howey* formulation was recently reaffirmed by the Supreme Court when it observed that

> the basic test for distinguishing the transaction from other commercial dealings is
>
>> "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Howey*, 328 U.S. at 301 [66 S.Ct., at 1104].

This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a

---

**4.** The term "security" is defined in § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). For purposes of this discussion, the term is defined in both statutes to include an "investment contract."

security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

*United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). It is widely agreed that the *Howey* test "subsumes within it three elements: first the existence of an investment of money; second, that the scheme functions as a common enterprise; and third, that profits of the enterprise are derived solely from the efforts of others." *SEC v. Continental Commodities Corp., supra,* 497 F.2d at 521.[5]

In light of this definition, the Seventh Circuit concluded that a discretionary account for trading in commodities futures was not a security, because the element of a common enterprise was lacking. *Milnarik v. M–S Commodities, Inc., supra,* 457 F.2d 274 (CA 7, 1972). The plaintiff in *Milnarik* had evidently argued that a common enterprise could be found between the plaintiff and the other customers of the same broker who had established discretionary accounts. The *Milnarik* majority pointed out, however, that "the success or failure of those other contracts had no direct impact on the profitability of plaintiffs' contract. [The broker's] various customers were represented by a common agent, but they were not joint participants in the same investment enterprise." 457 F.2d at 276–77. The *Milnarik* court therefore viewed the account between the customer and broker as "an agency-for-hire" and concluded that " 'the unitary nature of the contract here involved is not overcome even when the transaction is viewed most strongly against the defendants.' " *Id.* at 277.

It does not appear that the plaintiff in *Milnarik* made the argument that this "unitary" relationship between the investor-principal and the broker-agent could nonetheless constitute the "common enterprise" of the *Howey* test. Indeed, the opinion in *Milnarik* makes the implication that the common enterprise required must be common among a number of investors dealing with the same promoter or promoters. This relationship has been termed a "horizontal" common enterprise.[6] The Ninth Circuit Court of Appeals has held that the common enterprise required by *Howey* is "vertical (between the investor and promoter) rather than horizontal (among multiple investors)." *Hector v. Wiens,* 533 F.2d 429 (CA 9, 1976). The Seventh Circuit, however, in reaffirming its rule in *Milnarik,* recently made it clear that in the context of a discretionary trading account a horizontal common enterprise (in which the investors' funds are pooled) is indispensible to a finding of a security. *Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96, 101 (CA 7, 1977).

The Fifth Circuit Court of Appeals declined to follow the lead of the *Milnarik* court, and held that a discretionary account for the trading of commodities futures does meet the *Howey* definition of a security. *SEC v. Continental Commodities Corp.,* 497 F.2d 516 (CA 5, 1974). The *Continental Commodities* court seemed particularly concerned that the *Milnarik* court's failure to find a common enterprise was inconsistent with the Fifth Circuit's decision in *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (CA 5, 1974). *Koscot* involved a pyramiding scheme to sell cosmetics, and, more importantly, to sell distributorships for the sale of cosmetics. In order to find that this scheme was a security under the *Howey* test, the Fifth Circuit was forced to read the third *Howey* requirement, that profits be reaped *solely* through the efforts of others, somewhat liberally because the putative investors in *Koscot* did furnish at least

---

**5.** As to the requirement that profit be derived "solely from the efforts of others," both the Ninth and Fifth Circuit Courts of Appeal have indicated that the word "solely" should not be read literally so as to preclude a finding of a security where the putative investor supplies some, though relatively unimportant, effort.

*See SEC v. Glen Turner Enterprises,* 474 F.2d 476 (CA 9), *cert. denied* 414 U.S. 821, 98 S.Ct. 117, 38 L.Ed.2d 53 (1973); *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (CA 5, 1974).

**6.** *See SEC v. Commodity Options International, Inc.,* 553 F.2d 628, 633 n. 8 (CA 9, 1977).

some of the efforts. The *Koscot* decision determined that as long as " 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' " 497 F.2d at 483 (quoting *SEC v. Glen Turner Enterprises, Inc.,* 474 F.2d 476, 482 (CA 9), *cert. denied,* 414 U.S. 821, 98 S.Ct. 117, 38 L.Ed.2d 53 (1973)) the third requirement of *Howey* was met. In dealing with the requirement of a common enterprise, the Fifth Circuit in *Koscot* provided the following definition:

> "[A] common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties."

497 F.2d at 478 (quoting *Glen Turner, supra,* 474 F.2d at 482 n. 7). That definition, it should be noted, speaks of "the investor" in the singular, suggesting that the purely vertical common enterprise, involving only one investor and a promoter could satisfy the *Howey* definition of a security.

In *SEC v. Continental Commodities Corp., supra,* the Fifth Circuit rejected the rule of *Milnarik* because it found that rule inconsistent with the above quoted definition of a common enterprise. In finding that the discretionary trading account was a security, however, the opinion in *Continental Commodities* seemed to focus upon the horizontal relationship between investors, even though it had quoted definitions of common enterprise which indicated that the vertical promoter-investor relationship was crucial:

> [T]he critical inquiry is confined to whether the fortuity of the investments *collectively* is essentially dependent upon promoter expertise. . . . *[I]nvestors*

inexorably rely on Continental Commodities' guidance for the success of their investment. This guidance, like the efficacy of Koscot meetings and guidelines on recruiting prospects and consummating a sale, is uniformly extended to all its investors. That it may bear more productive fruits in the case of some options than it does in the case of others should not vitiate the essential fact that the success of the trading enterprise as a whole and customer investments individually is contingent upon the sagacious investment counseling of Continental Commodities.

497 F.2d at 522–23 (emphasis added).[7] In sum, while it is clear that the *Continental Commodities* court found a common enterprise to exist in that case, it is not clear whether that finding was based upon the horizontal relationship between the various customers of the defendant broker or the vertical relationship between the broker and a single customer.

If the common enterprise found in *Continental Commodities* was based upon the horizontal relationship between the discretionary account customers of the same broker, then the reasoning of the Fifth Circuit is adequately refuted by the opinion of then Judge Stevens in *Milnarik.* Nor does the rule of *Milnarik* in this regard undermine the validity of the finding of a security in *SEC v. Koscot Interplanetary, Inc., supra.* It is true that in *Koscot* the return to each investor was determined somewhat independently of the others because the return was based in part on the individual investor's efforts; it is crucial, however, that every Koscot investor was impacted upon in the same manner, that is either beneficially or detrimentally, by the success or failure of the underlying *Koscot* scheme.[8] It can-

---

**7.** As this quotation indicates, the *Continental Commodities* court did not base its departure from *Milnarik* upon the fact that the discretionary account in *Continental Commodities* was for the trading of options for commodities futures contracts, whereas the *Milnarik* account was simply for trading commodities futures contracts. The Court agrees that this factual distinction has no bearing on the existence of a common enterprise in these cases.

**8.** The *Koscot* court itself seems plainly to have noted this factor, in stating that the "critical factor is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts." *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 478 (CA 5, 1974).

not be said, however, that the success or failure of the broker's efforts in managing unrelated discretionary trading accounts will have the same impact upon every investor in the "enterprise." Since the common enterprise, viewed horizontally, must be the management of all discretionary trading accounts, the defendant could be ninety-nine percent successful in its advice to commodities futures investors, and yet any given investor could have lost everything. The inability of a given investor necessarily to benefit from the general success of this "enterprise" precludes a finding by this Court that the numerous customers of the defendant were involved in a "common enterprise" for purposes of the *Howey* test. *See Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96, 101 (CA 7, 1977).

If, however, the Fifth Circuit's finding of a common enterprise in *Continental Commodities* was based upon the "unitary" relationship between the plaintiff and defendant, a different question is posed. This would be a truly "vertical" common enterprise, in which the second requirement of the *Howey* test is found in the relationship between promoter and investor. If such a vertical common enterprise may be found, then the fact that the *Milnarik* court stressed the "unitary" and "principal-agent" nature of the transaction is an inadequate response to the Fifth Circuit's analysis, for that court was simply holding that such a unitary relationship may still be a common enterprise for purposes of defining a security. This Court nonetheless declines to accept this reading of *Continental Commodities,* essentially for two reasons.

Foremost is the fact that a finding of a common enterprise based solely upon the fact of entrustment by a single principal of money to an agent effectively excises the common enterprise requirement of *Howey.* The test would simply require (1) the investment of capital (2) with the expectation

of profit through the efforts of others, for nothing more is involved in a single discretionary trading account. Although the precise meaning of the phrase "common enterprise" is far from clear, nowhere in *Howey* or later Supreme Court decisions is it intimated that that phrase is somehow redundant of other elements of the definition of a security.

Secondly, the Court is further bolstered in its reluctance to define a security as broadly as the plaintiff urges in this context by the existence and applicability of a distinct regulatory scheme created by Congress in the Commodity Exchange Act of 1936, 7 U.S.C. § 1 *et seq.* The existence of parallel legislative schemes does not narrow the definition of a security,[9] but it does significantly undermine arguments that a security exists which are based ultimately on little more than Congress' "broad remedial purposes" in enacting the securities laws. In an analogous case, the Supreme Court recently dealt with the impact of ERISA on the issue of whether a noncontributory, compulsory pension plan is a security under *Howey.* In *International Brotherhood of Teamsters v. Daniel,* —— U.S. ——, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), the Court noted that ERISA dealt expressly with the area of pensions, and that the putative violations of the securities laws in that case could now be remedied under ERISA. *Id.* at ——, 99 S.Ct. 800. The Court therefore concluded that "[t]he existence of this comprehensive legislation governing the use and terms of employee pension plans severely undercuts all arguments for extending the Securities Acts to noncontributory, compulsory pension plans." *Id.*

In sum, this Court is impelled to reject the holding of *Continental Commodities* and to accept that of *Milnarik.* There can be no "vertical" common enterprise based solely on the relationship between promoter and investor which is consistent with *Howey.*[10]

9. For example, a discretionary trading account for commodities futures contracts in which investors' funds were pooled would probably be regulable under both the securities laws and the Commodities Exchange Act. *See Hirk v. Agri-Research Council, Inc., supra.*

10. Cf. *SEC v. Commodity Options International, Inc.,* 553 F.2d 628, 633 n. 8 (CA 9, 1977).

The Court recognizes that there are problems in adopting the *Milnarik* approach. The chief drawback is the appearance of making the number of investors determinative of the issue,

There can be no "horizontal" common enterprise between discretionary account customers without some relationship which ties the fortunes of each investor, at least to some degree, to the success of the overall venture.[11] The Court is of the opinion that the "economic realities" of this relationship militate against the finding of a security, and that the remedial purposes of Congress are well served by the applicability of the Commodity Exchange Act of 1936 to the conduct alleged in the instant complaint.

### B

The failure of the plaintiff to establish the jurisdiction of this Court under the securities laws does not mean that there is no other arguable basis for such jurisdiction. As indicated above, the Commodity Exchange Act of 1936, 7 U.S.C. § 1 et seq. would appear to apply to any fraud in the transactions between these parties. Specifically, Section 4b of the Act, 7 U.S.C. § 6b makes it unlawful "to cheat or defraud or attempt to cheat or defraud" any person such as the plaintiff in connection with the sale of commodities futures contracts.[12] The defendant does not dispute that the Commodity Exchange Act does create such a right. It is necessary to determine, however, whether infringement of that right may be remedied in the first instance by a private suit brought in this court.

Whether 7 U.S.C. § 6b creates an implied private cause of action is another question which has been resolved differently by federal courts. In this very circuit, one district court has held that no such private cause of action exists, *Consolo v. Hornblower & Weeks-Hemphill, Noyes, Inc.*, 436 F.Supp. 447, 454–55 (N.D.Ohio 1976), while another has held that "[t]here is no longer any doubt that a private cause of action exists under the Commodity Exchange Act." *Kelley v. Carr*, 442 F.Supp. 346, 354 (W.D.Mich. 1977). *See Moody v. Bache & Co., Inc.*, 570 F.2d 523, 529 (CA 5, 1978) (refusing to decide whether a private cause of action exists, but citing cases which have so found).

In general, the cases which have found an implied right of action under § 4b have relied on cases decided in the Seventh Circuit, especially *Goodman v. H. Hentz & Co.*, 265 F.Supp. 440 (N.D.Ill.1967) and *Deaktor v. L. D. Schreiber & Co.*, 479 F.2d 529 (CA 7), *reversed on other grounds*, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973). Both of these cases relied upon the Restatement of Torts, Section 286, stating that a private action would be implied if:

(1) the intent of the enactment is exclusively or in part to protect the interest of the [plaintiff] as an individual; and

(2) the interest invaded is one which the enactment is intended to protect.

*Goodman, supra,* 265 F.Supp. at 447; *Deaktor, supra,* 479 F.2d at 534. Most of the subsequent cases such as *Kelley v. Carr, supra,* concluded that a private cause of action exists without any analysis at all, but simply by citing these cases or their progeny. In light of the much more thorough

---

when a single discretionary account customer may be in need of precisely the same anti-fraud protection as two such customers whose funds are pooled. Indeed, there is no doubt that the single investor in this context subjects his capital contribution to significant risk, a factor which is deemed by many to be the crucial (though not sole) concern in defining a security. *See generally* Coffey, *The Economic Realities of a "Security": Is There a More Meaningful Formula?,* 18 W.Res.L.Rev. 367 (1967). It has been argued, however, that the potentiality of fraud is reduced in a single investor transaction. *Id.*

In any event, the Supreme Court has yet to hint that it is willing to drop the common enterprise requirement in favor of a more ex-

pansive "risk capital" approach which would transform *Howey* into a two-part rather than a three-part test. *See International Brotherhood of Teamsters v. Daniel,* —— U.S. ——, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 205, 44 L.Ed.2d 621 (1975).

11. *See Wasnowic v. Chicago Bd. of Trade,* 352 F.Supp. 1066 (M.D.Pa.1972), *aff'd without opinion,* 491 F.2d 752 (CA 3), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2407, 40 L.Ed.2d 773 (1974).

12. In addition to the statutory prohibition, see Rule 32.9 of the Commodity Futures Trading Commission (CFTC), 17 C.F.R. § 32.9.

treatment of whether to imply private causes of action in recent Supreme Court decisions such as *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) and *Piper v. Chris-Craft Industries*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), and in light of recent amendments to the Commodity Exchange Act of 1936, it is apparent that this authority must be reexamined.

The Supreme Court in *Piper v. Chris-Craft Industries, supra*, refused to allow a private cause of action on behalf of a disappointed tender offeror under § 14(e) of the Williams Act of 1968, 15 U.S.C. § 78n(e). In the course of its analysis, the Court considered not only the statute itself, but also four factors deemed relevant "in determining whether a private remedy is implicit in a statute not expressly providing one." 430 U.S. at 37, 97 S.Ct. at 947.

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," . . .—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. at 2088 (1975) [emphasis in original].

█ In considering the express provisions of the statute, it should be noted that the Commodity Exchange Act of 1936 was extensively amended by the Commodity Futures Trading Commission Act of 1974, 88 Stat. 1389 (1974). Most importantly, these amendments created the CFTC as the federal agency designated to administer and enforce the Act. Further, though less extensive, amendments were made in 1978.[13] Section 4b of the Act, 7 U.S.C. § 6b, of course, is silent as to how it is to be enforced, or whether a private party may bring a direct suit for its violation. Such was the case in *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) in which § 14(a) of the Securities Exchange Act of 1934 was also silent as to private remedies. The Court in *Borak*, however, found a private cause of action, and in large part relied upon § 27 of the same Act which granted to the appropriate district court jurisdiction over " 'all suits in equity and actions at law brought to enforce any liability or duty created' " by the 1934 Act. 377 U.S. at 430–31, 84 S.Ct. at 1559.

█ The Commodity Exchange Act has similar provisions creating jurisdiction in the district court. 7 U.S.C. § 13a provides that the Attorney General may bring an action in the district court to collect unpaid penalties assessed by the Commission. 7 U.S.C. § 13a–1 provides that the district court shall have jurisdiction of suits brought by the Commission or the Attorney General to restrain or enjoin violations of the Act. Newly added 7 U.S.C. § 13a–2, which became effective on October 1, 1978, provides that the attorney general or other designated officer of any state may bring a suit in equity or in law to enforce any liability created by the Act or to enjoin violations of the Act. Clearly, the grant of jurisdiction in these sections is made only with respect to specific plaintiffs, none of whom are private parties injured by a violation of 7 U.S.C. § 6b. No section grants general jurisdiction over "*all* suits at law or equity" brought to enforce the Act. Based upon the statute only, then, the Commodity Exchange Act provides a less convincing case than did *Borak* for the implication of a private right of action. The Court will now

---

**13.** This complaint was filed on September 16, 1977. There can be no doubt, however, that even the 1978 amendments, insofar as they affect the remedial procedures available to the plaintiff, apply with full force in this case. *Cort v. Ash*, 422 U.S. 66, 76–77, 95 S.Ct. at 2080 (1975); *see Fillinger v. The Cleveland Society for the Blind*, 587 F.2d 336 (CA 6, 1978).

turn to the four factors listed in *Cort v. Ash, supra.*

First, there is little question that the plaintiff is a member of the class for whose "especial" benefit the statute was enacted. Indeed, 7 U.S.C. § 6b is so concerned with the protection of the purchaser of commodities futures contracts that it creates liability for fraud only on the part of members of a contract market or one who makes a sale on behalf of any other person (i. e., a purchaser). There is no provision proscribing fraud on the part of the purchaser in 7 U.S.C. § 6b. It is also felt that the 1974 amendments were largely motivated by a desire to protect the less sophisticated general investor who was becoming increasingly involved in the trading of commodities futures. *See* Schief & Markham, *The Nation's "Commodity Cops"—Efforts by the Commission to Enforce the Commodity Exchange Act*, 34 Business Law 19 (Nov. 1978) and the legislative history cited therein. The Court is therefore of the opinion that the first factor of the analysis described in *Piper v. Chris-Craft, supra,* favors the implication of a private cause of action.

The second factor, whether there is any explicit or implicit indication of legislative intent to grant or deny a private cause of action, does not so favor the plaintiff. It is arguable that the description of private administrative remedies, such as the reparations procedure of 7 U.S.C. § 18(e), *see* S.Rep.No.93–1131, 93rd Cong. 2d Sess. § 106 (1974) *reprinted in* 1974 *U.S.Code Cong. & Admin.News,* pp. 5843, 5868–70, without recognition of a direct cause of action implies that no such direct action exists. There is no need to resort to so attenuated an implication, however, because the 1978 legislative history sets out what purports to be a list of private remedies under the Commodity Exchange Act. A direct cause of action is conspicuously absent:

> The Commodity Exchange Act provides many customer protections and remedies. The Act directs the Commission to promulgate and administer a regulatory program that includes registration of commodity professionals, segregation of customers' funds by futures commission merchants, establishment of dual trading guidelines, creation of a procedure for the adjudication of reparation claims, monitoring exchange arbitration procedures, and disciplinary actions, and licensing of industry self-regulatory futures associations. Moreover, customers are afforded protection through the Commission's power to sue for injunctive relief and to invoke a full range of administrative remedies where appropriate to curb unlawful behavior.
>
> The Commodity Futures Trading Commission was created in order to assure that a single expert agency would have the responsibility for developing a coherent regulatory program encompassing futures trading and related activities. Therefore, Congress has vested in the Commission exclusive jurisdiction to build upon the foundation provided by the Commodity Exchange Act in erecting a sound and strong Federal regulatory policy governing futures trading.

S.Rep.No.95–850, 95th Cong. 2d Sess. 12–13 (1978) *reprinted in* 1978 *U.S.Code Cong. & Admin.News,* pp. 3817, 3830–31. The above quoted passage unquestionably implies to this Court that there is no private cause of action for violations of the Act in the first instance, and that interpretation and application of the Commodity Exchange Act at the fact-finding level is intended to be left to the CFTC.

The third factor of the *Cort* analysis is whether implication of the private remedy sought is "consistent with the underlying purposes of the legislative scheme." *Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2088. While a private cause of action would certainly be one way in which to remedy the underlying evil at which the statute was aimed, it appears from the overall "scheme" which has ultimately been adopted that implication of a private cause of action would not be consistent. The powers and responsibilities of the CFTC are wide-ranging and thorough. The Commission acts as investigator, prosecutor and factfinder, and has the power to impose penalties and to issue

cease and desist orders. 7 U.S.C. § 18 provides an administrative procedure whereby "any person" may file a complaint with the CFTC. Any damages awarded under the reparations procedure described in 7 U.S.C. § 18(e) may be enforced in the district court. Any person (presumably the complainant or the respondent) aggrieved by any order of the Commission during this procedure may seek review in the United States Court of Appeals. Congress has thus devised a legislative scheme whereby the rights created by the Commodity Exchange Act are to be vindicated in the first instance administratively. In light of this scheme and the legislative history cited above, this Court is of the opinion that a plethora of private actions in the federal district court would deprive the CFTC of the opportunity "to build upon the foundation provided by the Commodity Exchange Act in erecting a sound and strong Federal regulatory policy governing futures trading." S.Rep.No.95-850, *supra* at 13, *U.S. Code. & Admin.News* 1978, p. 3831.

The fourth and final factor to be considered, whether the cause of action is one traditionally relegated to state law, has little relevance to a case such as this in which there are alternative *federal* remedies. The Supreme Court's treatment of this factor in *Cort v. Ash, supra,* 422 U.S. at 84–85, 95 S.Ct. 2080, 45 L.Ed.2d 26, indicates that a court should imply a private remedy when relegation to state law would frustrate the purpose of the federal statute. That is not the case here, where the state law does provide a remedy for fraud and deceit, and there is an additional federal private remedy available.

The Court therefore determines that jurisdiction under the Securities Act of 1933, the Securities Exchange Act of 1934, and the Commodity Exchange Act of 1936 has not been established in Count II. This count must therefore be dismissed.

### The Remaining Counts

The other eight counts of the second amended complaint must fall with the first two. No basis of federal jurisdiction is alleged other than the three statutes already mentioned. All claims premised upon the pendent jurisdiction of the court must be dismissed if there are no underlying federal causes of action.

The only counts which add new factual matter are Counts Five and Six. Count Five alleges fraud in the purchase of a certain palladium commodities contract. For the reasons stated with regard to Count Two, this count must also be dismissed. The same is true of Count Six which alleges a material omission with regard to a commodities contract for soybeans. Remedies for these transactions must be sought before the CFTC or in state court.

### The Motion to Stay

The Court notes that the prohibition of arbitration clauses in securities cases, see *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), does not apply in cases under the Commodity Exchange Act. Nonetheless, the Court's disposition of the motion to dismiss makes it unnecessary to decide this motion.

WHEREUPON, the Court determines that the motion to dismiss is meritorious and therefore GRANTED. The motion to stay pending arbitration is therefore rendered moot. The second amended complaint is hereby DISMISSED without prejudice to any rights the plaintiff has to pursue these claims in state court or before the Commodity Futures Trading Commission.