Tom N. MULLIS, Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER AND SMITH, INC., a Delaware Corporation, Defendant.

Civ. No. R–79–172 BRT.

United States District Court, D. Nevada.

July 1, 1980.

---

7. An action against D & M would be barred by the Workmen's Compensation Act, 24 V.I.C. Section 251, et seq.

Howington, Elworth, Osswald & Hough, Robert P. Howington, Jr., Donald C. Shine and Michael H. Moirano, Chicago, Ill., for plaintiff.

Orrick, Herrington, Rowley & Sutcliffe, W. Reece Bader, Steven A. Brick, James Belford Brown, Mary K. McEachron, San Francisco, Cal., and Belford & Semenza, Lawrence J. Semenza, Reno, Nev., for defendant.

## MEMORANDUM OPINION AND ORDER

BRUCE R. THOMPSON, District Judge.

This cause is before the Court on the defendant's motion to dismiss Counts I–V of the complaint for failure to state claims upon which relief can be granted and defendant's motion to stay proceedings pending arbitration.

The complaint states seven counts under federal and state securities laws, federal commodities laws and common law dealing with Merrill Lynch's allegedly careless and fraudulent activity in handling the plaintiff's accounts. Count I alleges a claim for

fraud under Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b5 of the Securities and Exchange Commission, 17 C.F.R. 240.10b5. Count II alleges a violation of Section 5(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77e(a)(1). Count III alleges a violation of Section 401 of the California Corporate Securities Law of 1968, Cal. Corporations Code § 25401. Count IV alleges a violation of Section 352c of the Martin Act, N.Y. Gen.Bus.L. § 352–c. Count V alleges violations of Sections 4b and 4g of the Commodity Exchange Act, 7 U.S.C. §§ 6b and 6g, and the regulations promulgated under the Act. Count VI alleges a common law breach of fiduciary duty. Count VII alleges a common law fraud.

In the spring of 1978, the plaintiff, who had previously traded through Merrill Lynch, recommenced trading in commodity futures through the San Francisco office of Merrill Lynch. In connection with this trading the plaintiff and Merrill Lynch entered into a "Commodity Account Agreement" which contains an arbitration clause. The plaintiff alleges that Merrill Lynch involved him in an "investment program" consisting of three parts: a non-discretionary commodity futures trading account, a Treasury Bill account and a money market fund. Cash deposited by the plaintiff was partially used to buy Treasury Bills. These Treasury Bills are allowed to function as a margin, in lieu of cash, for positions in commodity futures contracts. Cash not used to purchase Treasury Bills was to be kept in the trading account when required for additional margin and otherwise to be kept in the money market fund.

Without delving into the details at great length, the essence of the plaintiff's factual allegations is that Merrill Lynch failed to purchase the proper amount of Treasury Bill and money market accounts so that the value of those accounts appeared to be some $150,000 less than it should have been. In March of 1979 the plaintiff was long 200 contracts of copper and long 222 contracts of cotton. At the time in question, the market price of copper had declined below the level of the plaintiff's purchase price.

A Merrill Lynch representative telephoned the plaintiff to inform him that because of the price decline in copper, the plaintiff's cash and Treasury Bill accounts were not sufficient to margin his futures positions. Merrill Lynch requested the deposit of an additional $400,000. The plaintiff protested that the value of his accounts had been inaccurately calculated. Merrill Lynch rejected this objection and when the plaintiff could not meet the margin call, Merrill Lynch liquidated the long position of 200 copper contracts. Several days later a Merrill Lynch representative contacted the plaintiff to tell him that Merrill Lynch had discovered that a miscalculation had in fact occurred and that Merrill Lynch would rectify the situation. Copper futures prices rose after the liquidation and the long copper position was never reinstated or replaced by Merrill Lynch. The plaintiff claims an actual loss of $320,000, lost profits of $261,500 and consequential damages of $261,500 for a total of $849,300.

For the purposes of the motion to dismiss, the material allegations of the complaint are taken as true and a count of the complaint will not be dismissed unless it appears that the plaintiff can prove no set of facts in support of that count which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *California Dump Truck Owners Ass'n v. Associated General Contractors*, 562 F.2d 607 (9th Cir. 1977).

■ The plaintiff has asserted in response to the two motions by defendant that these motions cannot be decided concurrently. If the Court is disposed to grant the motion to stay pending arbitration, the plaintiff argues that the Court should defer consideration of the motion to dismiss until after arbitration is completed. *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) was a case involving a motion to stay pending arbitration. There, the Supreme Court held that the courts

"have no business weighing the merits of a grievance, considering whether there is

equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious."

Id. at 568, 80 S.Ct. at 1346 (footnote omitted). There can be no question, then, that a trial court should not consider the truth or falsity of the complaint's factual allegations in deciding a motion to stay pending arbitration.

On the authority of *Smith v. Gross,* 604 F.2d 639 (9th Cir. 1979), the plaintiff argues that a decision as to whether or not a security is involved is a decision on the merits which, under the *United Steelworkers* case, must be avoided. The court in *Smith* states that "The dismissal of an action for failure to show that a 'security' is involved is addressed to the merits and, thus, the judgment is based on failure to state a claim [under Fed.R.Civ.P. 12(b)(6)] rather than a lack of subject matter jurisdiction [under Rule 12(b)(1)]." 604 F.2d at 641. The word "merits" as used in this context, however, can only refer to the legal sufficiency of the complaint, since it is never proper to decide "merits" in the sense of factual allegations on a Rule 12(b)(6) motion. See Wright and Miller, *Federal Practice and Procedure*: Civil § 1357 (1979). Thus in considering a motion to dismiss a count of the complaint for failure to state a claim, the court does not direct what allegations may be brought to arbitration or what is the truth of the allegations; the court is saying that the alleged material facts, taken as true, do not, as to that count, state a legally sufficient claim in federal district court.

1. § 2 provides that the CFTC "shall have exclusive jurisdiction with respect to accounts, agreements . . . and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market . . . ."

2. The issue of whether or not a security is actually involved in this case is discussed in the next section.

## I. THE MOTION TO DISMISS

*A. Exclusive Jurisdiction of the Commodity Futures Trading Commission.*

One of the concerns raised by an examination of the complaint is the interaction or possible overlap between the jurisdiction of the commodity Futures Trading Commission (CFTC) and the jurisdiction of the Securities Exchange Commission (SEC). Merrill Lynch asserts that 7 U.S.C. § 2[1] preempts the application of federal (and state) securities laws *even where* it is presumed that a security or investment program is involved. For the purposes of this section the existence of a security is assumed arguendo,[2] but the main, if not sole, purpose for the existence of the security is to trade in commodity futures contracts.

Two other recent district court decisions, *Hofmayer v. Dean Witter & Co., Inc.,* 459 F.Supp. 733 (N.D.Cal.1978), and *Bartels v. International Commodities Corp.,* 435 F.Supp. 865 (D.Conn.1977), have considered the impact of § 2's language granting exclusive jurisdiction to the CFTC. In both cases the plaintiff's claims arising under federal securities regulations and statutes or state securities statutes were dismissed on the rationale that the grant of exclusive jurisdiction to the CFTC bars a private liability action based on securities laws. 459 F.Supp. at 737, 435 F.Supp. at 869.[3]

A careful perusal of § 2 and its legislative history raises, however, a crucial distinction (not discussed in *Hofmayer* or *Bartels*) which considerably complicates the question of exclusive jurisdiction. In addition to the grant of exclusive jurisdiction to the CFTC, § 2 also states that "nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." The distinction set up, then, is one

3. The court in *Fischer v. Rosenthal & Co.,* CCH Fed.Sec.L.Rep. ¶ 97,163 (N.D.Tex.1979) also dismissed, but without discussion, federal securities claims because of the CFTC's exclusive jurisdiction.

between *agency* jurisdiction and *court* jurisdiction. Therefore it is by no means a foregone conclusion that a grant of exclusive jurisdiction to the commodity *agency* to regulate commodity *transactions* preempts *judicial* application of security *statutes* to a security used for trading commodity futures.

■ There is ample evidence in addition to the plain language of § 2 to indicate that Congress intended to preempt SEC regulation in the commodity futures arena. The structure and powers of the CFTC are duplicative of the SEC.[4] The creation of this similar agency would make little sense if both were intended to regulate the same area. The legislative history clearly confirms that Congress intended the CFTC to preempt SEC regulation in commodity futures. The Senate Report states:

"The House Bill provides for exclusive jurisdiction of the Commission over all futures transactions. However, it is provided that such exclusive jurisdiction would not supersede or limit the jurisdiction of the Securities and Exchange Commission or other regulatory authorities.

"The Committee amendment retains the provisions of the House Bill but adds three clarifying amendments. The clarifying amendments make clear that (a) the Commission's jurisdiction over futures contract markets or other exchanges is exclusive and includes the regulation of commodity accounts, commodity trading agreements, and commodity options; (b) the Commission's jurisdiction, where applicable supersedes *State* as well as *Federal agencies* ; and (c) Federal and State courts retain their jurisdiction."

Sen.Rep.No.93–1131, 93d Cong., 2d Sess., (1974), 1974 U.S.Code Cong. and Admin. News, p. 5848 (emphasis added). The House Conference Report repeats this statement and adds that:

"Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would *preempt the field insofar as futures regulation* is concerned."

H.Conf.Rep.No.93–1383, 93d Cong., 2d Sess., (1974), 1974 U.S.Code Cong. and Admin. News, p. 5897 (emphasis added).

■ On the basis, then, of the grant of exclusive jurisdiction to the CFTC to regulate the commodities field, the SEC has no power to regulate securities whose dominant feature is participation in trading commodity futures. See *Birenbaum v. Bache & Co.*, 555 S.W.2d 513 (Tex.Civ.App. 1977); see generally Saitlin, *Exclusive CFTC Jurisdiction of Commodity Trading Vehicles*, 33 Bus.Law 241 (1977). This court is in complete agreement with Judges Schwarzer and Neuman insofar as their opinions state that since SEC jurisdiction is preempted, there can be no private liability actions based on SEC rules or regulations. 459 F.Supp. at 737, 435 F.Supp. at 869. Where these decisions proceed to the conclusion that the courts have no jurisdiction over private liability claims based on the securities *statutes*, this court must disagree.

■ The legislative history set out above very clearly makes the issue of court jurisdiction independent of the issue of agency jurisdiction. The over-all concept revealed in the language of the statute and the legislative history is: (1) The Commodity Exchange Act preempts any other federal or state statute dealing with commodity futures trading; (2) The jurisdiction of the CFTC preempts all other agency regulation in the commodities field, even regulation of a security, so long as the dominant purpose for the existence of the security is to trade in commodity futures; (3) The federal courts, however, specifically retain jurisdiction to decide cases arising under federal statutes.[5] Therefore, the federal courts

---

4. Compare the antifraud provisions of § 60(1) of the Commodity Exchange Act with similar provisions in the Investment Advisors Act of 1940 and the CFTC's powers under § 6 to the

SEC's powers under the Securities Exchange Act of 1934.

5. As well as, of course, ancillary jurisdiction over state statutory claims.

have jurisdiction to hear private liability claims based on the federal securities acts.

One court has, without discussion, termed the distinction between claims arising under securities statutes and claims arising under securities rules or regulations "anomalous." *Hofmayer v. Dean Witter & Co., Inc.,* at 737, n.2. The distinction may be anomalous if viewed narrowly from the perspective of a plaintiff in a private liability action. But what a private plaintiff may see as anomalous, this court sees as a collateral but necessary corollary to the grant of exclusive jurisdiction to the CFTC so that the agency may achieve the clear supremacy Congress intended.

B. *The Existence of a Security Under Federal, California and New York Securities Laws.*

1. Federal Securities Laws.

■ Although originally the subject of some controversy, it is by now widely agreed that a commodity futures trading account by itself is not a security, regardless of whether the account is non-discretionary,[6] *Fischer v. Rosenthal & Co.,* supra n.3, *Berman v. Bache, Halsey, Stuart, Shields, Inc.,* 467 F.Supp. 311 (S.D.Ohio, 1979); *E.F. Hutton & Co., Inc. v. Burkholder,* 413 F.Supp. 852 (D.D.C.1976); *Consolo v. Hornblower & Weeks-Hemphill, Noyes,* 436 F.Supp. 447 (N.D.Ohio 1976); or discretionary,[7] *Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 622 F.2d 216 (6th Cir. 1980); *Brodt v. Bache & Co., Inc.,* 595 F.2d 459 (9th Cir. 1980); *Milnarik v. M-S Commodities, Inc.,* 457 F.2d 274 (7th Cir.), cert. denied 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). The plaintiff here alleges that even if the account itself is not a security, the account taken together with the Treasury Bill account and the money market account constitutes an "investment program" which is a security. A survey of the reported decisions in this area reveals that this is apparently a question of first impression.

Whether an investment program is a security is a question independent from the securities aspects of the separate parts of the program. See *SEC v. Commodity Options International,* 553 F.2d 628 (9th Cir. 1977). Furthermore, the fact that a security was traded in one of the parts of the investment program is irrelevant to determining whether the program is a security. See *SEC v. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1945). Cf. *Brodt v. Bache & Co., Inc.,* supra. In short, the trading of securities by the money market fund, itself concededly a security,[8] does not establish whether the investment program as a whole is a security.

■ The Supreme Court has stated in *Tcherepnin v. Knight,* 389 U.S. 322, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) that "in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." Viewed in the light most favorable to the plaintiff, the economic reality of this program was that the non-discretionary commodity account was a very large dog wagging a very small tail of interest bearing accounts. Approaching the problem from this perspective, we now apply the facts as alleged to the classic definition of a security announced by the Supreme Court in the *Howey* case. In order to find a security, there must be "an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301, 66 S.Ct. at 1104.

■ The first element is clearly satisfied since the plaintiff alleges the investment of money. The second element requires finding a "common enterprise." Here there is no "horizontal commonality of interest" since there were no other investors besides the plaintiff. *Milnarik v. M-S Commodi-*

---

6. That is, where the customer makes all trading decisions and issues orders to the broker.

7. That is, where the broker has authority to execute trades without consulting the customer.

8. The Merrill Lynch Ready Asset Trust is registered with the SEC.

*ties, Inc.*, 457 F.2d at 278. However, in the Ninth Circuit the more liberal "vertical commonality of interest"[9] is the standard. In *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n.7 (1973), the Ninth Circuit defined a common enterprise involving vertical commonality as one in which the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties."

Under the facts alleged in the complaint there could not be a common enterprise. Merrill Lynch was not a partner or joint venturer with the plaintiff. Merrill Lynch's success or failure as a business is entirely independent from the success or failure of the plaintiff's investment program. Merrill Lynch's financial interest is limited to commissions earned. This is true of both the commodities account and the Treasury Bill account (no commissions are paid on transactions for shares in the money market fund.) In fact, Merrill Lynch's success, measured in terms of commissions earned, is equally likely whether the plaintiff did very well in his trading or very poorly. Whether the plaintiff engaged in a strategy involving many trades or few trades (with corresponding activity in the cash amounts) had an impact on Merrill Lynch's fortunes only to the extent that if the plaintiff eventually lost all his money Merrill Lynch would not longer earn commissions on his accounts. This situation could not be much farther from one where the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment. . . ." Id. Here, as in *Brodt*, "since there is no direct correlation on either the success side or failure side . . . there is no common enterprise. . . ." 595 F.2d at 461.

Even were there a common enterprise, the plaintiff's theory fails the third hurdle of the *Howey* test: profits to come solely from the efforts of others. Here, the efforts were not solely or even largely Merrill Lynch's but rather the plaintiff's. The economic reality of this arrangement was that the plaintiff made all commodity trading decisions; the broker merely executed plaintiff's orders and transferred money among the three accounts. Merrill Lynch's "efforts" in this program pale into virtual insignificance in comparison to the plaintiff's efforts. And, even if Merrill Lynch's efforts did, through interest earned, contribute some quantum of profit to the investment program, the amount of those profits is miniscule compared to the "profit to come" from the plaintiff's commodity trading. Lacking two of the three elements required under *Howey*, the plaintiff's "investment program" does not constitute a security for the purposes of either the 1933 Act or the 1934 Act.[10]

Plaintiff has, somewhat belatedly, raised the argument that, exclusive of whether or not the alleged investment program is a security, Merrill Lynch's failure to purchase securities with a part of the free cash balance from the trading account constitutes an actionable deceptive and manipulative practice under § 10(b) of the 1934 Act and Rule 10b–5.[11] It is evident from the complaint that this theory was not yet conceived when the complaint was drafted. The two most immediately apparent difficulties with the argument are whether the requisite scienter has been alleged and whether the requisite manipulation, deception or misrepresentation has been alleged.

■ Scienter is a necessary element of a violation of § 10(b) and Rule 10b–5. This is true whether the plaintiff is a private par-

---

**9.** Vertical commonality requires only "that the investor and the promoter be involved in some common venture without mandating that other investors also be involved in that venture." *Brodt v. Bache & Co., Inc.*, 595 F.2d at 461.

**10.** *Tcherepnin v. Knight*, 389 U.S. at 335–36, 88 S.Ct. 548, 552–553 (in construing the term "security" within the meaning of the 1934 Act for

the first time, the court was able to rely on past constructions of the 1933 Act, since the definitions were "virtually identical.")

**11.** Since this subset of allegations involves only the securities area with no commodities impact, the argument as to CFTC jurisdiction does not apply.

ty, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), or the SEC, *Aaron v. SEC*, —— U.S. ——, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). The Supreme Court stated in *Hochfelder* that allegations of simple negligence are not sufficient to sustain a cause of action under § 10(b) and Rule 10b–5. 425 U.S. at 193, 96 S.Ct. at 1381. Accord *Aaron v. SEC* —— U.S. at ——, 100 S.Ct. at 1952. However, in both the *Aaron* and *Hochfelder* cases, the Supreme Court specifically left open the question of whether recklessness is sufficient to satisfy the scienter requirement. It is clearly the rule in the Ninth Circuit,[12] as well as in several other circuits,[13] that recklessness does satisfy the scienter requirement.

■ The relevant allegation in this case is found at paragraph 18 of the complaint:

. . . "defendant Merrill Lynch used only $146,717.67 to purchase securities, the balance of which [originally $293,-435.34] the defendant failed both to invest and take into account in determining the value of his [plaintiff's] securities accounts."

This statement appears to allege mere negligence. Additionally, this allegation does not indicate the existence of any manipulation, deceit, or misrepresentation involved in the failure to purchase. See *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). However, the allegations are somewhat ambiguous and the court can conceive of some set of facts which might properly support this claim. Therefore, as to this theory, the dismissal shall be with leave to amend the complaint. The court particularly directs the plaintiff's attention to scienter, standing and manipulation or misrepresentation.

**2. California and New York Securities Laws.**

■ As noted above, state regulation of futures trading and accounts is preempted by the exclusive jurisdiction of the CFTC. However, if a security exists under applicable state statutes, a private liability action will lie as to statutory violations involving that investment vehicle.

The California courts have held that decisions interpreting the term "security" in the context of federal securities laws are authoritative in interpreting the term "security" under § 25019. *Hamilton Jewelers v. Department of Corporations*, 37 Cal.App.3d 330, 112 Cal.Rptr. 387 (1974). Therefore, the discussion in the immediately preceding section is equally applicable here and the investment program does not constitute a security under § 25019.

New York General Business Law § 352–c prohibits fraud in the sales of securities. As in California, the New York courts have held that the state statute and the federal securities laws are congruent and that the definition of a "security" for New York state purposes is ruled by the federal definition in *SEC v. Howey. Gardner v. Lefkowitz*, 97 Misc.2d 806, 412 N.Y.S.2d 740 (S.Ct. N.Y.1978). The investment program is not a security under § 352–c.

**C. The Existence of a Private Right of Action Under the Commodity Exchange Act.**

The question of whether there is a private right of action under the CEA since the extensive amendments to the Act in 1974 [14] has deeply divided the federal courts. Some of the more recent decisions holding that there is no private right of action include: *Hensley v. Maduff & Sons,*

---

**12.** *Nelson v. Serwold*, 576 F.2d 1332, (9th Cir.), *cert. denied* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

**13.** *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir.), *cert. denied* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978), *aff'g* 424 F.Supp. 1021 (S.D.N.Y.1977); *Coleco Industries, Inc. v. Berman*, 567 F.2d 569 (3d Cir. 1977); *cert. denied* 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.3d 124 (1978), *aff'g* 423 F.Supp. 275

(E.D.Pa.1976); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.), *cert. denied* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

**14.** Many cases recognized a private right of action prior to the 1974 amendments, see *e. g., Case & Co., Inc. v. Board of Trade of the City of Chicago*, 523 F.2d 355 (7th Cir. 1975).

*Inc.*, CCH Comm.Fut.L.Rep. ¶ 21,017 (C.D. Cal.1980); *Stone v. Saxon & Windsor Group, Ltd.*, 485 F.Supp. 1212 (N.D.Ill.1980); *Fischer v. Rosenthal & Co.*, 481 F.Supp. 53 (N.D.Tex.1979); *Fairchild, Arabatzis & Smith, Inc. v. Prometco*, 470 F.Supp. 610 (S.D.N.Y.1979); *National Super Spuds, Inc. v. New York Mercantile Exchange*, 470 F.Supp. 1256 (S.D.N.Y.1979); *Berman v. Bache, Halsey, Stuart, Shields, Inc.*, 467 F.Supp. 311 (S.D.Ohio 1979).

Other courts have held that there is a private right of action under the Act: *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, CCH Fed.Sec.L. Rep. ¶ 97,390 (6th Cir. 1980); *Grayson v. Conticommodity Services, Inc.*, 48 L.W. 2807 (D.D.C.1980); *Alken v. Lerner*, 485 F.Supp. 871 (D.N.J.1980); [15] *Smith v. Groover*, 468 F.Supp. 105 (N.D.Ill.1979); *Jones v. B.C. Christopher & Co.*, 466 F.Supp. 213 (D.Kan. 1979); *Hofmayer v. Dean Witter & Co., Inc.*, 459 F.Supp. 733 (N.D.Cal.1978); *Kelley v. Carr*, 442 F.Supp. 346 (W.D.Mich.1977).

Because of the deep division of opinion, this court has devoted considerable study to the issue and finds itself in agreement with those courts holding that there is no private right of action under the Act. The Ninth Circuit has yet to speak on this issue and although the Sixth Circuit's contrary holding is to be accorded great weight, it is not binding on this court. *Aknin v. Phillips*, 424 F.Supp. 104 (S.D.N.Y.1976). This is particularly true where the other circuit's appellate decision is unconvincing. *Maple v. Citizens National Bank & Trust Co.*, 437 F.Supp. 66 (W.D.Okl.1977). The court in *Curran* considered the private right of action issue sua sponte with no briefing by the parties and no discussion of the carefully considered contrary holdings of other courts. Under these circumstances this court, especially since it is convinced that *Curran* was wrongly decided, will not follow that decision.

The four-part inquiry set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) is the accepted method of investigating whether a private right of action should be judicially implied. However, any analysis of a private right of action must take into account the recent Supreme Court decisions in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), and *Piper v. Chris-Craft Industries*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). In *Piper* the court held that there was no private right of action in favor of takeover bid contenders under the Williams Act; the emphasis in the opinion is addressed to whether the judicial creation of a cause of action "is *necessary* to effectuate Congress' goals." Id. at 26, 97 S.Ct. at 941. (Emphasis added.) See also *Network Project v. Corporation for Public Broadcasting*, 561 F.2d 963 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978). The Ninth Circuit analyzed the *Touche Ross* and *Transamerica* cases in *Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9th Cir., 1980), saying that "[t]he Supreme Court's decisions in *Touche Ross* and *Transamerica* reflect a restrictive approach to implying private rights of action." The courts, in adopting a restrictive approach to the implication of private actions, should pay particular attention to whether the private remedy is necessary to effectuate Congressional goals.

The four-part inquiry in *Cort* is: first, whether the plaintiff is within the ambit of protection of the statute; second, what is the relevant legislative history; third, whether the private remedy is consistent with the statutory scheme provided; and

---

**15.** *Alken* cites *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman*, 593 F.2d 129 (8th Cir. 1979) and *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96 (7th Cir. 1977) as recognizing a private right of action under the CEA. This interpretation of these two cases is erroneous. The court held in *Goldman* that there is a private right of action for fraudulent violations of exchange and dealer association rules. The court in *Hirk* did not address the issue of whether or not there is a private right of action under the CEA; rather the court assumed (without discussion) the right of private action and held that the plaintiff had stated a cause of action under § 4(b) of the CEA.

fourth, whether a remedy was traditionally available under state law. *Cort*, at 422 U.S. at 78, 95 S.Ct. at 2088. These factors are not necessarily to be accorded equal weight since the main focus of the inquiry is whether Congress intended to create the private right. *Transamerica*, 100 S.Ct. at 249. See *Touche Ross*, 442 U.S. at 575–76, 99 S.Ct. at 2489; *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

Clearly the plaintiff in this case, a commodities investor, falls within the class for whose "especial benefit the statute was enacted." At the time of the decision in *Cannon*, this factor appeared to be quite important, especially where the legislative history was ambiguous. *Cannon*, 99 S.Ct. at 1956. The more recent decision in *Transamerica* indicates a deemphasis of the special benefit element. This may well be because the *Cannon* case involved sex discrimination and the court is more inclined to give the benefit of the doubt to those victims rather than investors as a class. See also *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *Keaukaha-Panaewa Community Association v. Hawaiian Homes Commission*, 588 F.2d 1216 (9th Cir. 1978). The special benefit element, then, indicates some positive, but not dispositive, evidence for a private right of action. The fourth element of the *Cort* test also provides some small support for the implication of the right of private action. Since the regulation of futures trading has traditionally been a matter of federal law, the implication of a private right of action would not infringe on an area of state concern. *Alken v. Lerner* at p. 878; Cf. *Fischer v. Rosenthal & Co.*, supra.

The much more difficult questions lie in the more important second and third elements of the *Cort* test. In the second part of the *Cort* test, the court is required to search the legislative history to find "any indication of legislative intent, explicit or implied, either to create such a remedy or to deny one" *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088. The logical place to begin this investigation is in the language of the statute. *Transamerica*, 100 S.Ct. at 245. The cata-

logue of remedies available under the Commodity Exchange Act, 7 U.S.C. § 1 et seq., is surprisingly lengthy.

Individual floor traders are subject to the rules of the exchanges to which they belong. If an exchange fails to enforce its own rules or the CFTC's regulations, the CFTC may initiate an administrative proceeding in which a civil penalty of up to $100,000 may be assessed against the exchange and the exchange's designation as a contract market may be suspended or revoked. Id. §§ 13a, 7b, 8. The CFTC can institute administrative proceedings with the aid of the subpoena power to forestall violations of the Act or any rule or regulation promulgated under the Act. Id. § 15. The agency has direct enforcement power over individuals and may, after an administrative hearing, revoke or suspend trading privileges and impose civil penalties of up to $100,000. Id. § 9. Furthermore, the agency is empowered to issue cease and desist orders. Id. § 13b. In lieu of administrative proceedings, the CFTC or the Attorney General may proceed in federal court in an action for injunctive relief or in a criminal prosecution for violations of certain sections of the Act. Id. § 13.

In addition to these enumerated powers for governmental enforcement actions, the 1974 amendments to the CEA create two explicit means of vindicating private rights: (1) the arbitration proceeding under § 7a(11) for claims of up to $15,000; and (2) reparations proceedings under § 18 for claims of any size.

In *Transamerica*, the Supreme Court has strongly reiterated the applicability of the principle of *expressio unius est exclusio alterius* to this area of inquiry:

"[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.' "

*Transamerica*, 100 S.Ct. at 247 (citations omitted). Accord, *National Railroad Passenger Corporation v. National Association of Railroad Passengers*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); *Securities Investor Protection Corporation v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). The court in *Transamerica* then proceeded to examine the list of remedies provided in the Investment Advisors Act. Significantly, *each* remedy mentioned by the court under the Investment Advisors Act is also available under the CEA as amended. *Transamerica*, 100 S.Ct. at 247; CEA remedy discussion, supra. However, the two private remedies under §§ 7 and 18 of the CEA are additional remedies *not* available under the Investment Advisors Act. Therefore, at least as far as the statutory language is concerned, there is even less reason to imply a private right of action here than there was in *Transamerica*. In our case it seems even more improbable that Congress "absentmindedly forgot to mention an intended private action." *Transamerica*, 100 S.Ct. at 247.

This interpretation of the statutory language is supported by the available legislative history. At the time of the 1974 amendments the federal district courts had recognized a private right of action under the CEA.[16] Thus the focus of the examination of the 1974 and later legislative history is whether Congress intended to approve the private right of action or to nullify it. H.R. 11195[17] was introduced in the House on October 30, 1973. It contained a provision expressly granting a private right of action for treble damages. This bill was

rejected. In the Senate two bills, S. 2378 and S. 2837,[18] were introduced on this subject. S. 2378 provided for a private right of action for treble damages and S. 2837 provided for a private right of action for single damages and allowed treble damages for willful violations. Both bills were rejected by the Senate Agriculture and Forestry Committee.[19] The rejection of these bills is explicit evidence of specific Congressional intent to repudiate the private right of action. The fact that both the bills allowing treble damages and the bill allowing single damages in the majority of cases were rejected implies that Congress was disapproving the entire concept of a private right of action, not just the treble damages portion.[20] After all, the damages language could easily have been excised had that portion been the only objectionable material.

Neither does the language of § 2 ("Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.") indicate a Congressional intent to preserve a previously implied right of action. Senator Talmadge's remarks make clear that this provision was intended as a savings provision to prevent any chronological gap in regulation,[21] to lighten the burden on the courts and to preserve appellate jurisdiction over administrative proceedings.[22] The most logical interpretation of these comments is that the provision of the remedies in the CEA would preclude the private right of action (and thus ease the burden on the courts) but yet appellate jurisdiction is preserved.

---

16. See, *e. g., Goodman v. H. Hentz & Co.*, 265 F.Supp. 440 (N.D.Ill.1967).

17. H.R. 11195, 93rd Cong., 1st Sess. Section 17(3) (1973).

18. S. 2837, 93rd Cong., 1st Sess. Section 505 (1973); S. 2378, 93rd Cong., 1st Sess. Section 20(3) (1973).

19. *Hearings* on S. 2485, et al., before the Senate Committee on Agriculture and Forestry, 93rd Cong.2d Sess., Part I, p. 77.

20. *Contra, Alken v. Lerner*, supra.

21. "[S]ection 412 (§ 2) was included in the bill to make clear that all pending proceedings, including ongoing investigations, as well as court proceedings, should continue unabated by any provision of the Act. This also is necessary in order to prevent the creation of any regulatory gaps. . . ." 120 Cong. Rec. 34997 (1974).

22. "It is hoped that giving the Commission this authority will somewhat lighten the burden on the courts, but the entire appeal process and the right of final determination by the courts are expressly preserved." 120 Cong. Rec. 30459 (1974).

In 1978, Congress again considered the remedies available under the CEA. At that time Senator Huddleston stated during the floor debate on the 1978 amendments that some federal courts "have taken the unfortunate position" that there is no private right of action implied under the CEA.[23] Had Congress shared the Senator's view it could have explicitly mentioned such a remedy.[24] However, in a Senate report listing private remedies under the CEA, the private right of action is most conspicuous by its absence:

> "*The Commodity Exchange Act provides many customer protections and remedies.* The Act directs the Commission to promulgate and administer a regulatory program that includes registration of commodity professionals, segregation of customers' funds by futures commission merchants, establishment of dual trading guidelines, creation of a procedure for the adjudication of reparation claims, monitoring exchange arbitration procedures and disciplinary actions, and licensing of industry self-regulatory futures associations. *Moreover, customers are afforded protection through* the Commission's power to sue for injunctive relief and to invoke a full range of administrative remedies where appropriate to curb unlawful behavior."

S.Rep. 95–850, 95th Cong. 2d Sess., (1978), 1978 U.S.Code Cong. & Admin.News, pp. 2100–2101 (emphasis added). In light of the denial of the private right of action by several federal district courts and in light of the Senate Committee's finding that the Commission had "limited resources to enforce the law in the face of pervasive fraudulent practices,"[25] Congress could have approved the private right of action. Instead it created a statutory cause of action for state enforcement of the CEA. 7 U.S.C. § 13a–2.

The remaining element of the four-part test from *Cort v. Ash* is whether the implication of the private right would be consistent with the underlying purposes of the legislative scheme. 422 U.S. at 78, 95 S.Ct. at 2088. Here, the broad range of enforcement powers granted to the CFTC, the provisions for private administrative remedies and the Congressional instruction that the CFTC erect a "sound and strong Federal regulatory policy governing futures trading"[26] all indicate that a private right of action is neither necessary to (*Piper v. Chris-Craft*) nor consistent with the legislative scheme. As was well-stated by the Second Circuit in a Federal Aviation Act case:

> "The implication of a private right to sue for damages does not inevitably complement the work of the agency charged by Congress with the enforcement of a statute. Private litigation tends to transfer regulatory interpretation and discretion from the agency to the courts, which are ill-equipped to undertake the burdens thus imposed upon them. Inconsistency in enforcement may well ensue. Moreover, the deterrent effect of damage litigation is largely incidental, and Congress may conclude that statutory compliance will be better achieved by more efficient and less expensive means."

*Caceres Agency v. Trans World Airways, Inc.*, 594 F.2d 932, 934 (1979) (citations omitted). Here, the implication of a private right of action under the CEA would be inconsistent with the statutory framework because "a plethora of private actions in the federal district court would deprive the CFTC of the opportunity 'to build upon the foundation provided by the Commodity Exchange Act in erecting a sound and strong Federal regulatory policy governing futures trading.'" *Berman*, supra, 467 F.Supp. at 323.

---

**23.** 124 Cong. Rec. 10537 (1978).

**24.** *National Super Spuds, Inc. v. New York Mercantile Exchange*, 470 F.Supp. 1256 (S.D.N.Y.1979).

**25.** S.Rep. 95–850, 95th Cong. 2d Sess., (1978), 1978 U.S.Code Cong. & Admin.News, p. 2087.

**26.** Legislative History of P.L. 95–405, 95th Cong.2d Sess., (1978), 1978 U.S.Code Cong. & Admin.News, p. 2101.

1358

■ Viewed as a whole, the *Cort* analysis reveals that the legislative history and consistency elements, which are the most important, weigh strongly against the implication of a private action. With the emphasis on Congressional intent mandated in *Touche Ross* and *Transamerica* and the emphasis on the relative necessity of implying the private remedy as discussed in *Piper*, this court holds that there is no private right of action under the CEA.

## II. THE MOTION TO STAY PENDING ARBITRATION

After plaintiff opened his accounts at Merrill Lynch, he signed a Commodity Account Agreement. Paragraphs 6, 7 and 8 deal with an agreement to arbitrate. Paragraph 6 states:

"ANY CLAIM, GRIEVANCE OR CONTROVERSY BETWEEN US ARISING OUT OF YOUR BUSINESS OR THIS AGREEMENT SHALL BE SETTLED BY ARBITRATION BEFORE THE NEW YORK STOCK EXCHANGE OR THE CONTRACT MARKET UPON WHICH THE TRANSACTION GIVING RISE TO THE CLAIM, GRIEVANCE, OR CONTROVERSY WAS EXECUTED OR INTENDED TO BE EXECUTED. YOU SHALL HAVE THE RIGHT OF ELECTION AS TO WHICH OF THE FOREGOING TRIBUNALS SHALL CONDUCT THE ARBITRATION."

Paragraph 7 informs the signer that the CFTC requires that his consent to arbitration be voluntary and it specifies that he need not agree to the arbitration clause contained in Paragraph 6 in order to open an account with Merrill Lynch. Paragraph 8 states:

"BY SIGNING THIS AGREEMENT, YOU MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW BUT YOU ARE NOT WAIVING YOUR RIGHT TO ELECT LATER TO PROCEED PURSUANT TO SECTION 14 OF THE COMMODITY EXCHANGE ACT TO SEEK DAMAGES SUSTAINED AS A RESULT OF A VIOLATION OF THE ACT. IN THE EVENT A DISPUTE ARISES YOU WILL BE NOTIFIED IF MERRILL LYNCH INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU BELIEVE A VIOLATION OF THE COMMODITIES EXCHANGE ACT IS INVOLVED AND YOU PREFER TO REQUEST A SECTION 14 'REPARATIONS' PROCEEDING BEFORE THE CFTC, YOU WILL STILL HAVE 45 DAYS IN WHICH TO MAKE THAT ELECTION."

At the bottom of the Account Agreement are two boxes, either one of which the customer may sign. The left-hand box contains a line for the customer signature and the sentence: "I have read the arbitration clauses and understand ·and agree with them. (Paragraphs 6, 7 & 8)." The right-hand box contains a signature line and the sentence: "I have read the arbitration clauses and do not agree that they are part of our agreement. (Paragraphs 6, 7 & 8)." Plaintiff signed the left-hand box, indicating agreement to the arbitration provisions.

Section 3 of the United States Arbitration Act, 9 U.S.C. § 1 et seq., requires that if: (1) the arbitration agreement is enforceable under 9 U.S.C. § 2; (2) the suit concerns any issue referable to arbitration; and (3) the moving party is not in default in proceeding with arbitration, then the court must stay the trial of the action pending arbitration. *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). See *China Union Lines, Ltd. v. American Marine Underwriters, Inc.*, 458 F.Supp. 132 (S.D.N.Y.1978).

A. *The Enforceability of the Agreement Under 9 U.S.C. § 2.*

9 U.S.C. § 2 provides:

"A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

The agreement between plaintiff and defendant is clearly a written provision in a

contract. The commodity futures business is a paradigm of an area involving interstate commerce. See *Hornblower & Weeks-Hemphill Noys, Inc. v. Csaky*, 427 F.Supp. 814 (S.D.N.Y.1977).

██ As to whether the arbitration provisions could be revoked in law or equity, the plaintiff claims that he was fraudulently induced to agree to the arbitration provisions and that the provisions are in any event void at law because failure to conform to 17 C.F.R. § 180.3 (CFTC Regulations on Arbitration) renders the arbitration agreement void and unenforceable. The court held a hearing on March 4, 1980, confined to the issue of whether or not there had been fraud in the inducement of the arbitration agreement. The evidence adduced at the hearing showed that plaintiff is an extremely sophisticated investor with years of experience in speculating in commodity futures. There was absolutely no credible evidence of any fraud or misrepresentation in the inducement to sign the arbitration agreement. In fact, plaintiff's own testimony showed that the Merrill Lynch account executive had never even urged plaintiff to sign the box agreeing to arbitration. Rather, the account executive had urged plaintiff to sign *either* box without any comment as to what the agreement entailed. The claim of fraud in the inducement of the arbitration agreement is patently frivolous and the hearing was a complete waste of the court's time and the parties' money.

██ Merrill Lynch has suggested that the holding in *Prima Paint* restricts the trial court to denying enforcement of an otherwise valid arbitration clause *only* on the ground of fraud in the inducement of the clause. By inference, then, defendant suggests that the court may not examine the assertion that the arbitration agreement is void for failure to conform to 17 C.F.R. § 180.3. The language of *Prima Paint* does not support this argument. The court stated:

"We hold, therefore, that in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate."

388 U.S. at 404, 87 S.Ct. at 1806. Thus in *Prima Paint* it was held proper to consider the issue of fraud in the inducement of the arbitration clause but not proper to consider the issue of fraud in the inducement of the entire contract. Here, the issue of the arbitration agreement's conformity to 17 C.F.R. § 180.3 is "an issue relating to the making and performance of the agreement to arbitrate" and is thus a proper issue for this court's consideration.

The CFTC has approved the use of pre-dispute arbitration agreements if the customer's consent to the agreement is voluntary. § 180.3(a). The regulations establish four straightforward requirements in determining whether customer consent is voluntary: (1) the agreement to arbitrate cannot be a condition for opening the account; (2) the customer must separately endorse the arbitration clauses; (3) the customer may not be required to waive his right to seek reparations; and (4) the customer agreement must contain two paragraphs of specified boldface cautionary language. § 180.-3(b). The Merrill Lynch Customer Account Agreement complies exactly with each of these requirements.

██ The plaintiff, however, raises the novel argument that other language in § 180.3 establishes a further requirement without which the agreement is not voluntary:

"(3) The agreement may not require the customer to waive the right to seek reparations under section 14 of the Act and Part 12 of these regulations. Accordingly, the customer must be advised in writing that he or she may seek reparations under section 14 of the Act by an election made within 45 days after the futures commission merchant, floor broker or associated person notifies the customer that arbitration will be demanded under the agreement. This notice must be given at the time when the futures commission merchant, floor broker or associated person notifies the customer of

the intent to arbitrate. <u>The customer must also be advised that if he or she seeks reparations under section 14 of the Act and the Commission declines to institute reparation proceedings, the claim or grievance will be subject to the preexisting arbitration agreement and must also be advised that aspects of the claims or grievances that are not subject to the reparations procedure</u> (9.e. do not constitute a violation of the Act or rules thereunder) <u>may be required to be submitted to the arbitration or other dispute settlement procedure set forth in the preexisting arbitration agreement.</u>"

§ 180.3(b)(3) (emphasis added). The plaintiff contends that the language underlined above requires that this advisory also be included in the original arbitration agreement.

This argument has some force when examined solely from the viewpoint of the policy behind the requirements for disclosure language in the arbitration agreement. The main objective of these regulations is to ensure that the customer understands what he is getting into before he agrees to the settlement procedures. It would certainly serve this purpose if the customer were informed that the CFTC can decline to accept a reparations proceeding request. It might, for instance, be possible that a customer would be willing to waive his right to proceed in court in the first instance if he knew his dispute would go to reparations before the CFTC, yet the customer might not be willing to forego his day in court if the only alternative turned out to be arbitration.

However well this suggested requirement comports with the policy behind § 180.3, the language of the regulation provides strong evidence that this construction was not intended. The language that plaintiff relies on ("The customer must *also* be advised . . . .") clearly refers back to the immediately preceding sentence which discusses a notice to be given "at the time when the futures commission merchant . . . notifies the customer of an intention to arbitrate." The underlined sentence also

makes reference to the "preexisting arbitration agreement. . . ." This reference is inconsistent with an intention to require the notice in the arbitration agreement itself.

Furthermore, the next subsection, § 180.-3b(4), expressly sets out the boldface cautionary language that the Commission requires be included in the agreement. The CFTC has also rejected the idea that additional warnings should be incorporated into the language set forth in (4):

"While the Commission is of the view that the legal implications of the proposed language could be spelled out in all their ramifications, it would be virtually impossible to do so in less than several highly technical paragraphs. The result would be a longer and perhaps more confusing document. Accordingly, the Commission has opted for a short, concise statement, which it believes focuses on the significant aspects of the customer's rights in understandable form."

41 Fed.Reg. 42944 (Sept. 29, 1976). The Customer Account Agreement conforms to the requirements of § 180.3b and is enforceable under the regulations. There are, then, no grounds at law or in equity for revoking the arbitration agreement. The language of the arbitration clause ("Any claim, grievance or controversy between us arising out of your business or this agreement . . .") satisfies 9 U.S.C. § 2's requirement of a written provision "to settle by arbitration a controversy thereafter arising out of such contract. . . ." Therefore, the arbitration agreement is enforceable under 9 U.S.C. § 2.

B. *9 U.S.C. § 3's Requirement of Issues Referable to Arbitration.*

Under the decision on Merrill Lynch's motion to dismiss, the plaintiff is left with, at most, three claims: (1) the claim involving the failure to purchase securities under Rule 10b–5 and § 10b of the Securities Exchange Act of 1934; (2) the breach of fiduciary duty claim; and (3) the fraud claim. There is no doubt that the fact pattern alleged by the plaintiff is exactly what was meant to be covered by the arbi-

tration agreement in this case. The alleged errors and failures of Merrill Lynch could not be more intimately connected with the business and agreement between plaintiff and defendant.

If the plaintiff can successfully amend the complaint to state a cause of action under Rule 10b–5 and § 10b of the 1934 Act, it would appear, although it is by no means settled, that the doctrine of *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) should be applied to prevent the arbitration of this claim. The international considerations which governed the decision in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (mandating the arbitration of a 1934 Act claim) are not present in this case. See *Merrill Lynch, Pierce, Fenner & Smith v. Moore*, 590 F.2d 823 (10th Cir. 1978); *Weissbuch v. Merrill Lynch, Pierce, Fenner and Smith*, 558 F.2d 831 (7th Cir. 1977); *Ayres v. Merrill Lynch, Pierce, Fenner & Smith*, 538 F.2d 532 (3rd Cir. 1976).

Although the CFTC rules ensuring the voluntariness of the arbitration agreement appear to vitiate somewhat the reasons for the application of the *Wilko* doctrine, the Supreme Court has so strongly stated the policy of preserving the individual securities investor's right to a judicial determination of his claim that this court will not hold that the 1934 Act claim is referable to arbitration.

C. *The Movant is Not in Default in Moving for Stay Pending Arbitration.*

 Merrill Lynch filed its motion for stay concurrently with the motion to dismiss and before any discovery or hearings. Far more preliminary activity has been permitted without losing the right to arbitrate. *China Union Lines v. American Marine Underwriters*, 458 F.Supp. 132 (S.D. N.Y.1978) (no waiver where motion for stay made 21 months after complaint filed, even though answer on merits had not asserted

right to arbitration but defendant had not taken advantage of discovery); *Demsey & Associates, Inc. v. S.S. Sea Star*, 461 F.2d 1009 (2nd Cir. 1972) (dicta) (merely answering on the merits, asserting a counterclaim or participating in discovery without more will not necessarily constitute a waiver). Furthermore, the Ninth Circuit requires not only an act inconsistent with the assertion of the right to arbitration, but also actual prejudice to the other party before there is a waiver. *Shinto Shipping Co., Ltd. v. Fibrex & Shipping Co., Inc.*, 572 F.2d 1328 (1978). Here there has been neither an act inconsistent with the right nor any actual prejudice to the plaintiff. Merrill Lynch is not in default in proceeding with the right to arbitrate.[27]

In accordance with these premises, *IT HEREBY IS ORDERED* that:

1. Counts I, II, III, IV and V of the complaint are dismissed.

2. Plaintiff shall have twenty days to amend Count I of the complaint as hereinabove discussed. Reallegation or restatement of the other dismissed counts will not be tolerated.

3. Other than the amendment of Count I of the complaint, all further proceedings are stayed in the interests of judicial economy until arbitration is completed.

---

27. Plaintiff's claim that Merrill Lynch waived its right to arbitrate by an alleged promise to make him whole is not an allegation of procedural default but rather an allegation of waiver by reason of laches. Waiver by reason of laches is a question for the arbitrator. *N & D*

*Fashions, Inc. v. DHJ Industries, Inc.*, 548 F.2d 722 (8th Cir. 1976). See *International Union of Operating Engineers Local 150 v. Flair Builders, Inc.*, 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972).