UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
Plaintiff,

v.

John D. LAUER, Clifton Capital Investors
L.P., Konex Holding Corporation, Lyle
E. Neal, Copol Investments Limited and
Joseph Polichemi, Defendants.

No. 94 C 3770.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 20, 1994.

Gregory Paul Von Schaumburg, Lori Ann Trowbridge and Ronald Eleger Wood, S.E.C., Chicago, IL, for plaintiff.

Susan Getzendanner, Donna L. McDevitt and Michael Stephen Terrien, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for defendants.

### MEMORANDUM, OPINION AND ORDER

ANDERSEN, District Judge.

Plaintiff, Securities and Exchange Commission ("SEC") has filed a motion for preliminary injunction. In their response, defendants John D. Lauer and Clifton Capital Investors L.P. ("CCI") (hereinafter collectively referred to as "defendants") have raised a challenge to the jurisdiction of the SEC to bring this action and to the jurisdiction of this court to entertain the case. For the reasons stated below, we deny Lauer and CCI's challenge to the jurisdiction of this court.

### BACKGROUND

Since February 1993, Lauer has been Director of the Risk Management and Benefits Departments at the Chicago Housing Au-

thority ("CHA"). The CHA is a federally funded municipal corporation which provides public housing to residents of the city of Chicago. The CHA has 5,400 employees, approximately 2,400 of which are covered by CHA's Defined Benefit Plan. As the Director of Benefits, Lauer controls the assets in CHA's Benefit Plan and until October 1993, made all investment decisions for the assets in the Plan. Lauer is a Certified Financial Planner and was formerly a Series 7 and 63 registered representative.

Defendant CCI is an Illinois limited partnership formed in November 1992. CCI is located in Clifton, Illinois and its general partners are Lauer and Kenneth Senffner. Since its inception, CCI has provided certain limited administrative support to CHA, has sold insurance, rehabilitated residential property and acted as the administrator for the Konex Roll Program ("Roll Program").

Defendant Konex Holding Corp. ("Konex") is a Nevada corporation with an office in Lexington, Kentucky. Konex was incorporated in August 1991 and its registration was revoked in May 1993. Konex claims to offer "International Financial Investments" and is the promoter of the Roll Program.

Defendant Lyle E. Neal is a resident of High Hat, Kentucky. Neal is Chairman, Chief Executive and sole shareholder of Konex. Until January 1993, Neal was also purportedly an officer of Copol. Defendant Copol Investments Limited ("Copol") is an entity headquartered at St. Peter Port, Guernsey, British Virgin Islands. Copol was incorporated in the British Virgin Islands on March 5, 1991. Copol purportedly buys and trades Prime Bank Instruments for Konex and others. Defendant Joseph Polichemi is a U.S. citizen who resides in London, England and Florida. Polichemi is the Chairman of Copol.

Since at least January 1993, Konex has been offering and promoting its Roll Program. In connection with that offering, Konex has raised at least $12.5 million from at least one investor, CHA's Benefit Plan. In addition, in or about March 1994, the Roll Program received another $1.5 million from Lauer.

Konex's solicitations were made through a group of finders who would be compensated if they found investors for the Konex Roll Program. Neal provided these finders with information on the Program for their use in soliciting prospective investors. In or about January 1993, one of the finders contacted Lauer, CHA's Director of Benefits, and introduced him to Konex's Roll Program. The finder explained that Konex would use investor funds to purchase and trade instruments issued by the "top 100 World Prime Banks" and that investors would earn a 25%–75% annual return. Lauer told the finder that he was not interested.

Several weeks later, Neal, Konex's owner and Chairman, contacted Lauer and reiterated what Konex's finder had stated and added that Konex only dealt with the "top 25 European Prime Banks." Neal also told Lauer that bank instruments would be pre-sold before being purchased, thereby substantially reducing risk and guaranteeing profit.

Because of a shortfall in Benefit Plan assets created by early retirements at the CHA, Lauer concluded that higher returns were required to eliminate this deficit. At that time, the Benefit Plan's assets were earning only a market rate of interest. Because Neal and Konex's finder previously told Lauer of the high rate of interest available from the Konex Roll Program, Lauer considered it as a possible means to cover the Benefit Plan's deficit. Lauer contacted Neal in mid-February 1993 to learn more about the Roll Program.

After Lauer expressed interest in the Roll Program, Neal employed a concerted effort to convince Lauer of the viability of the Program, the high returns to be earned and the safety of the investment. In or about late February 1993, Lauer met with Neal in Florida. At the meeting, Neal stated that CHA would earn 1½% per trade and could reasonably expect approximately 40 trades per year. For the stated minimum $10 million investment, this would result in a per trade return of $150,000, or a return of approximately 60% annually. Neal also advised Lauer that Konex's European affiliate, Copol, would actually handle the trades. According to Neal, Copol, through Polichemi, had been

trading Prime Bank Instruments for 20 years. Copol agreed to pay Konex 3% per face amount of the transaction for every successful roll trade. The 1½ percent return was to be paid out of that amount.

As a follow up to their February meeting, on or about March 11, 1993, Neal directed Konex's attorney to send Lauer an attestation letter stating that he had spoken with certain individuals and what those individuals told them concerning Konex, Copol, Polichemi and the Roll Program.

In late March 1993, Lauer met with Neal and Konex's attorney in New York. At this meeting, Neal presented Lauer with certain draft contracts. In addition, Neal gave Lauer for his review a Konex promotional brochure regarding trading purported Prime Bank Instruments through the Roll Program. The brochure stated, among other things, that funds would be held in the "investor's name in a prime world bank account and could be withdrawn at any time." The brochure stated a projected range of returns. Finally, it concluded by reemphasizing that the investor's "funds are always secure."

Also at the meeting in New York, Neal told Lauer that four to five other investors and a "substantial" trust had already invested. Neal also represented that funds from these investors would ultimately be pooled with CHA funds to purchase Prime Bank Instruments. Polichemi also met with Lauer and described his 20 years' experience in successfully trading purported Prime Bank instruments, including transactions allegedly made on behalf of Saudi Arabia's royal family.

In late March 1993, Lauer invested $10 million in Konex's Roll Program, ostensibly on behalf of CHA. Despite the fact that $10 million of CHA funds were used to make the investment, all contracts relating to the investment identified CCI, a company Lauer controlled, as the investor. Contemporaneous with signing these agreements, Lauer agreed to have CCI act as administrator for the Roll Program. As the administrator,

CCI was to receive a fee of ⅛ of 1% of the face amount invested for each Roll Program trade.

Pursuant to Neal's instructions, Lauer subsequently wired $10 million of CHA funds to an attorney trust account established to receive and disburse investor funds in the Roll Program. From that trust account, CHA's funds were immediately wired to Copol's bank account at Kreditbank, S.A., Luxembourg.

In April 1993, Neal advised Lauer that a successful trade had been made. Lauer, on behalf of CCI, directed the alleged profits from the trade, $150,000, to a Konex account, not to the CHA. CCI received a fee of $12,500 as Konex's administrator. In May 1993, Neal advised Lauer that a second successful trade had been made. CCI reinvested the alleged profits from that trade. As Konex's administrator, CCI again received its fee of $12,500. Between April and May 1993, Lauer invested another $2.5 million in the Roll Program, of which at least $1 million was CHA's money.

In approximately June 1993, Neal advised Lauer that additional funds would be needed to trade Prime Bank Instruments. Lauer did not invest additional amounts and, therefore, Konex claimed Copol could not perform any more trades. Beginning in or about June 1993, Lauer requested Konex to produce, pursuant to their contract, documents regarding the alleged successful trades. Konex never provided Lauer with those documents. Beginning in approximately mid–1993, Lauer requested the return of CHA funds. To date, the CHA's funds have not been returned.

Between August 1993 and January 1994, CCI allegedly received over $4 million from Copol. The SEC alleges that Lauer then used those funds to purchase, among other things, his $1.01 million personal residence.

In March 1994, Lauer caused an additional $1.5 million to be deposited into the Roll Program trust account.[1] Following the de-

---

1. Plaintiff and defendants disagree as to the total amount invested by Lauer in the Konex Roll Program. The SEC claims that the total figure is $14 million, while defendants claim the figure is

$12.2 million. Defendants make no mention of Lauer's alleged $1.5 million transfer in March 1994 and they claim that the SEC is "double counting" $300,000 of reinvested funds.

posit, Lauer caused the transfer of $735,000 to CCI's bank account at Oak Trust and Savings Bank in Chicago, Illinois, instead of forwarding these funds to buy and trade purported Prime Bank Instruments. Lauer also caused the transfer of $765,000 to Neal and others.

The SEC has brought this action alleging violations of Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)) and Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 thereunder (17 C.F.R. § 240.10b–5). These provisions generally prohibit schemes or artifices to defraud in connection with the offer, sale or purchase of securities.[2] The SEC claims that an interest in the Konex Roll Program constitutes an investment contract which, by definition, is a security under both Section 2(1) of the Securities Act (15 U.S.C. § 77b(1)) and Section 3(a)(10) of the Securities Exchange Act (15 U.S.C. § 78c(a)(10)).

The SEC claims that Lauer made material misrepresentations and omissions and misappropriated investor funds. Lauer invested CHA Benefit Plan funds through CCI, a company Lauer owns, which served as administrator of Konex's Roll Program. CCI thereafter received $25,000 from purported trades made with CHA funds. Lauer never informed CHA about CCI's role in the Roll Program or about the nature of the investment itself. Thus, the SEC claims that Lauer failed to disclose the role of his company in the transaction, his receipt of compensation resulting from CHA's investment and his resulting conflict of interest.

In addition, in May 1993, Lauer allegedly wrote a letter to a prospective investor which falsely represented, among other things, that CHA was receiving returns in excess of 70% annually. The letter also stated that Lauer had presented the Roll Program to the Benefit Plan's Board of Trustees. Lauer allegedly wrote this letter to encourage other investments and to provide additional income to

CCI in the form of administrative fees. Lauer also informed other prospective investors that CHA was satisfied with its Roll Program investment. Thus, the SEC claims that Lauer knowingly made false and misleading statements to prospective investors in endorsing Konex's Roll Program.

Lauer and CCI, on the other hand, claim that the Konex Roll Program is a sophisticated "con" game by which defendants Neal and Polichemi lured their victim, Mr. Lauer, into a financial back alley in order to "roll" him.

The SEC also claims that Konex, Neal, Copol and Polichemi each misrepresented and omitted to state material facts to induce Lauer and others to invest in the Roll Program. According to the SEC, Neal and Polichemi, acting through Konex and Copol, respectively, falsely represented that investor funds would be used to purchase and trade Prime Bank Instruments. Konex, through its arrangement with Copol, did not purchase and trade Prime Bank Instruments. Moreover, Konex, through Copol, could not buy and trade Prime Bank Instruments as represented.

In addition, Neal and Polichemi, acting through their companies, claimed that Konex would trade approximately 40 times per year and generate a 60% annualized return. In fact, Konex had no ability to generate returns of this magnitude because it had no ability to successfully trade Prime Bank Instruments. Thus, the SEC claims that Konex and others falsely represented the rate of return associated with the investments.

Furthermore, Neal and Polichemi, acting through their companies, consistently emphasized the safety of investing in the Roll Program. In fact, according to the SEC, the investment was fraught with risk. From the moment CHA funds were wired to Copol in an account controlled by Polichemi, the CHA lost control of the funds, has not since been able to access or recover any portion of the

---

**2.** Section 17(a) of the Securities Act applies to the "offer or sale" of securities while Section 10(b) of the Securities Exchange Act and Rule 10b–5 thereunder apply to the "purchase or sale" of securities. These terms are broadly defined. Section 2(3) of the Securities Act (15 U.S.C. § 77b(3)) defines sale to include "every

contract of sale ... for value" and defines offer to include every "solicitation of an offer to buy, a security or interest in a security, for value." Similarly, Section 3(a)(13) of the Securities Exchange Act (15 U.S.C. § 78c(a)(13)) defines purchase to include "any contract to buy, purchase or otherwise acquire."

principal, has not received any Prime Bank Instrument and has not received any information on the specific location of the CHA's funds. Thus, the SEC alleges that Konex and others misrepresented the true risk associated with an investment in the Roll Program.

Finally, the SEC claims that Neal and Polichemi, acting through their companies, have misrepresented the status of CHA's investment. They have repeatedly advised Lauer that CHA funds are in accessible accounts, but have not been able to produce any confirmation of the status or location of the funds. Nor have they returned the funds despite Lauer's repeated requests. A permanent injunction has been entered against defendants Konex, Neal, Copol and Polichemi by way of default.

## DISCUSSION

Defendants Lauer and CCI claim that the SEC has no jurisdiction to bring this action and that this court has no jurisdiction to entertain the case. Defendants first argue that even if the Konex Roll Program was a legitimate investment program, the CHA's investment in that program would not constitute a "security" within the meaning of the federal securities laws because it does not meet the Seventh Circuit's horizontal commonality test. Second, defendants argue that when a "con man" uses the promise of an investment in "nonexistent securities" as the lure to separate a victim from his money (as opposed to the promise of an investment in "nonexistent" real estate, fake diamonds, or any other fraudulent bait), the act is one of conversion and *not* a violation of federal securities laws.

### I. JURISDICTIONAL STANDARD

This action is brought pursuant to the special jurisdictional provisions of Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)) and Section 27 of the Securities Exchange Act (15 U.S.C. § 78aa). Those sections provide that the district courts of the United States shall have jurisdiction of violations of the Securities Act and Securities Exchange Act and of all suits brought to enforce any liability or duty created by those Acts. 15 U.S.C. §§ 77v(a) and 78aa. This case is also brought pursuant to the general federal question jurisdiction provision of 28 U.S.C. § 1331.

The parties dispute the standard to be applied in ruling on this jurisdictional challenge. The district court has the responsibility to determine the existence of subject matter jurisdiction and to gather the facts necessary to make that determination. *Christison v. Groen*, 740 F.2d 593, 597 n. 4 (7th Cir.1984). *See also Western Transp. Co. v. Couzens Warehouse*, 695 F.2d 1033, 1038 (7th Cir.1982); *Nuclear Eng'g Co. v. Scott*, 660 F.2d 241, 252 (7th Cir.1981). Moreover, "if the complaint had failed to allege a fact that was a predicate for the power of the federal court to act ... the complaint would have failed for lack of jurisdiction." *Haas v. Wieboldt Stores, Inc.*, 725 F.2d 71, 73 (7th Cir.1984).

In this case, in order to state a claim under the Securities Acts, we must first establish that a "security" exists. The threshold question in any action brought pursuant to the Securities Acts is whether a security exists. *See Meridian Software Funding, Inc. v. Pansophic*, 1992 WL 107310, 1992 U.S. LEXIS 7225 (N.D.Ill.1992). Therefore, we will examine the SEC's claims to determine whether it has adequately shown all the elements of a "security."

### II. INVESTMENT CONTRACT

The first issue is whether the investment in the Roll Program sold by the defendants constitutes an investment contract and, thus, is a security within the provisions of the Securities Act and the Securities Exchange Act. Both plaintiff and defendants agree that if this investment is a "security" at all, it is as an "investment contract." In addition to conventional securities such as stocks and bonds, both the Securities Act and the Securities Exchange Act define the term "security" to include an "investment contract." 15 U.S.C. §§ 77b(1) and 78c(a)(10). Neither Act, however, defines what is an "investment contract."

In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946), the United States Supreme Court de-

fined an investment contract as: 1) an investment of money; 2) in a common enterprise; 3) with an expectation of profits to be derived solely from the efforts of others. The Supreme Court stated that the definition "embodies a flexible rather than static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299, 66 S.Ct. at 1103. In addition, the Supreme Court stated "[t]he statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae." *Id.* at 301, 66 S.Ct. at 1104.

The SEC claims that each of the elements of the *Howey* test has been met. Defendants concede that the first and third elements have been met.[3] Defendants' sole argument is that the requirements of the second element, the common enterprise, have not been met.

The Seventh Circuit requires a common enterprise which is satisfied by the "horizontal commonality" test. *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir.1994); *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 276–78 (7th Cir.), *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). Horizontal commonality is "a pooling of interests not only between the developer or promoter and each individual 'investor' but also among the investors . . . in short, a wheel and not just a hub and a spoke." *Wals,* 24 F.3d at 1018 (citation omitted).

According to defendants' argument, since only one investor is specifically identified, no security in the form of an investment contract can be found to exist because the requisite horizontal commonality is lacking. Defendants believe that the existence of a security in this case rises or falls solely on the question of whether there are other investors besides the CHA who were defrauded and whose funds were pooled with CHA funds. The SEC disagrees that there is only one investor whose money was pooled in this scheme. However, even assuming that the

CHA was the sole investor, the SEC argues that such fact alone would not be dispositive on the question of whether a security exists. We believe that the commonality element has been met in this case.

### A. *Pooling of Investor Funds*

#### 1. *Actual Pooling*

■ Defendants contend that no horizontal commonality exists because there was only one investor. At this point, whether any other investor funds actually were pooled with CHA funds is unclear. The SEC is unable to specifically name other investors. However, as part of the solicitation of Lauer, Neal told Lauer that there were four to five other investors as well as a trust investor. Neal told Lauer that he was handling the administration for these investors. Neal has testified that the CHA's initial $10 million investment was combined with $90 million from other investors to make the first (April 1993) and second (May 1993) successful trades in Prime Bank Instruments. In addition, Lauer has admitted, and the relevant documents reflect, that the CHA's investment would be pooled with money from others.

The SEC is in the process of conducting discovery to determine the number of investors in the Roll Program. The SEC has propounded interrogatories and document requests to defendants Polichemi and Copol requesting information relating to the offer and sale of Prime Bank Instruments. Moreover, this court has ordered defendants Copol, Polichemi, Neal and Konex to identify all investors who were solicited, offered or sold Prime Bank Instruments. In conducting such discovery, the SEC has learned that defendant Copol solicited investments in Prime Bank Instruments from numerous other investors. Specifically, the SEC has learned that two California and two Florida residents invested in Prime Bank Instruments with Copol. While there is no indication at this point that these investors were involved in the Konex Program, it does ap-

---

**3.** Defendants concede that the first element has been met and state that "the third prong of the test arguably may be met here . . ." Defendants, however, have offered *no* evidence contradicting the presence of the third element and hence concede that the third element has been met as well.

pear that Copol received funds from other investors in connection with the purchase and sale of Prime Bank Instruments. Thus, we believe that the SEC has sufficiently proven at this point that the CHA's funds were to be pooled with funds from other investors in an investment contract which intended to buy and sell purported Prime Bank Instruments.

2. *Design of the Scheme*

■ Assuming that actual pooling did not occur, the SEC argues that federal subject matter jurisdiction still exists because the requisite pooling of funds necessary to establish horizontal commonality is demonstrated by the design and marketing of the scheme, as well as the intent of the parties as derived from the statements made by Lauer and Neal.

In this case, it is clear that the Konex Roll Program contemplated the pooling of investor funds and was so presented to Lauer during the solicitation of the CHA's initial investment. Other investors were solicited in an effort to raise additional funds for the Roll Program. Konex and Copol needed to raise and pool $100 million to purportedly trade Prime Bank Instruments. If that amount were raised, all investors would profit from the purported trading of Prime Bank Instruments. If the money were not raised, investors would not profit because there would be no trading. Under these circumstances, investors' fortunes would rise and fall together in a common enterprise.

Moreover, the compensation to be paid investors was based upon the difference between what the Prime Bank Instruments were purportedly bought for and the amount for which they were sold. Finally, Copol and Konex were to be compensated, as was the CHA and other investors, for each successful purchase and resale of Prime Bank Instruments. Thus, Copol's and Konex's profits were directly linked in a common interest with the CHA and other investors. Thus, we find that the SEC has proven a "wheel" of common interests sufficient to satisfy the Seventh Circuit's horizontal commonality test. *See, e.g., Wals,* 24 F.3d at 1018.

The central issue in the cases cited by defendants involved whether a discretionary commodities trading account constituted a security, or whether the purchase of certain assets, including paintings and a time-share in a condominium unit, intended to be purchased by a single investor, similarly constituted a security under the horizontal commonality test. *See, e.g., Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274 (7th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972) (individual investor discretionary commodities trading account held not to involve pooling); *Hirk v. Agri–Research Council, Inc.,* 561 F.2d 96 (7th Cir. 1977) (individual investor discretionary commodities trading account held not to involve pooling); *Stenger v. R.H. Love Galleries, Inc.,* 741 F.2d 144, 146 (7th Cir.1984) (purchase of paintings with repurchase agreements); *Frederiksen v. Poloway,* 637 F.2d 1147, 1152 (7th Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981) (purchase of a marina with employment contract. "After the sale, [the defendant] was an employee of ECC, not a participant in an enterprise whose profits were shared").

In the cases cited by defendants, the fortunes of the investors did not rise and fall together, and each investor was unaffected by the profits or losses of the other investors. "Each contract ... is unitary in nature and each will be a success or failure without regard to the others. Some may show a profit, some a loss, but they are independent of each other." *Milnarik,* 457 F.2d at 277. Thus, unlike the facts of this case where investors' profits would rise and fall in a common enterprise, that element of commonality was missing in the cases cited by defendants.

■ In addition to the contemplated pooling, Konex's Roll Program was also sold like a security. For example, prospective investors, including Lauer, were solicited ·for the Roll Program by finders located across the country by means of cold calls and otherwise. These finders were provided with information by Konex to use in their solicitation efforts. Solicitation letters were also used in the offer and sale of these Roll Program securities. Similarly, the finders were paid a fee if an investment was in fact made. Finders presented the investment as a safe high-

yield investment. Lauer admits that he invested funds in the Roll Program to earn a high rate of return. The program was marketed as having a dominant investment intent in view of the emphasis on the extraordinary returns which could be earned on an investment. *See Adams v. Cavanagh Communities Corp.,* 847 F.Supp. 1390, 1399 (N.D.Ill.1994). Therefore, the marketing of the investment indicates that it is a security.

Some courts also have held that the intent of the parties should be examined in determining the existence of horizontal commonality. *See Glazer v. National Commodity Research and Statistical Services, Inc.,* 388 F.Supp. 1341 (N.D.Ill.1974), *aff'd,* 547 F.2d 392 (7th Cir.1977). In *Glazer,* the court held:

> What plaintiffs are arguing, in effect, is that an agreement which is not an 'investment contract' can be transformed into an investment contract by the unilateral fraud of one party in violation of the original understanding. Whether an 'investment contract' exists depends, like any other contract, upon the original intention of the parties to the arrangement.

*Id.* at 1344 (quoting *Wasnowic v. Chicago Bd. of Trade,* 352 F.Supp. 1066, 1070 (M.D.Pa.1972)). The intent of the parties may be derived "by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." *SEC v. United Benefit Life Ins. Co.,* 387 U.S. 202, 211, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673 (1967) (quoting *SEC v. Joiner Leasing Corp.,* 320 U.S. 344, 352–53, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943)). *See also Howey,* 328 U.S. at 301 ("it is enough that the respondents merely offer the essential ingredients of an investment contract.")

The economic reality of the transaction is that the Roll Program is a security. The manner in which the investment was marketed, the contemplated pooling of investor funds, and the intent of the parties, all satisfy the horizontal commonality test and hence establish the existence of a security. We believe that the SEC and the federal courts are not required to simply stand by when confronted by a massive fraud like this one and wait until multiple victims are separated from millions of dollars before seeking relief.

### III. *"NONEXISTENT SECURITIES"*

■ Lauer and CCI next claim that the federal securities laws do not apply because Prime Bank Instruments do not exist. Defendants argue that if any fraud occurred, it was not done in connection with the offer, purchase or sale of a security and, therefore, federal securities laws do not apply.

First, we believe that "securities" do exist in this case. The securities at issue are investment contracts in the Konex Roll Program. Lauer entered into contracts establishing the investment in the Roll Program. These contracts constitute a purchase or sale of securities. What does not exist is the business of buying and trading Prime Bank Instruments for profit because there is no market for such instruments to be traded. The Konex Roll Program is itself an investment contract which falls within the definition of a security for both the Securities Act and Exchange Act. As a result, the federal securities laws apply since there is fraud in connection with the offer, purchase or sale of securities.

However, even assuming the Roll Program involved a "nonexistent security," many courts have extended jurisdiction under the federal securities laws to cases alleging fraud in connection with the offer, purchase and sale of securities which do not actually exist. "The fact that the securities did not exist does not remove this action from the operation of the federal securities laws." *Mishkin v. Peat, Marwick, Mitchell & Co.,* 744 F.Supp. 531, 553 n. 10 (S.D.N.Y.1990).

Defendants cite *Smith v. Chicago Corp.,* 566 F.Supp. 66, 68 (N.D.Ill.1983) in support of their position. In that case, plaintiffs ordered the purchase of securities but their money was instead misappropriated. The court found that the plaintiffs had no standing to sue because they could not allege "that anyone purchased or sold any securities." *Id.* at 69. Furthermore, the court found that plaintiffs "did not make any decision relevant to the purchase of securities based on [the broker's] representations." *Id.* at n. 4.

Other courts have narrowly construed *Smith.* In *First Nat'l Bank of Chicago v. Shearson, Lehman Bros., Inc.,* 1989 WL 165009, at *4, 1988 U.S.Dist. LEXIS 17186, at 28 (N.D.Ill.1989), for example, the court distinguished *Smith* because, in the case before the court, the plaintiff had signed a contract and that contract established a sale of a security, whereas in *Smith* there was no such contract. The court noted that:

> although the plaintiffs in *Smith* directed their broker to purchase specific securities, they did not go so far as to enter into a contract to buy these securities. In contrast, the plaintiff here took all steps necessary to acquire [such securities].... Furthermore, the plaintiff here, unlike the plaintiffs in *Smith,* did rely on fraudulent misrepresentations in deciding whether to acquire an interest in the securities.

*Id.* at *4, at 28.

■ In this case, Lauer entered into contracts establishing the investment in the Roll Program. These contracts, by definition, constitute a "purchase" or "sale" of a security. The fact that trading in Prime Bank Instruments never occurred is irrelevant because "[t]hose who enter into a contract to buy securities are entitled to the same protection as those who actually buy securities". *Butterworth v. Integrated Resources Equity Corp.,* 680 F.Supp. 784, 786 (E.D.Va.1988).

■ Similarly, defendants Neal and Polichemi made misrepresentations to Lauer which Lauer repeated in his solicitation letters to prospective investors. Lauer also lulled and misled his employer about the investments he had made. Therefore, we find that the SEC has sufficiently made out a case for fraud in connection with the purchase or sale of a security and, thus, federal securities laws do apply.

## IV. *FRAUD IN THE OFFER OF A SECURITY*

The SEC also alleges violations of Section 17(a) for fraud in the offer of a security. 15 U.S.C. § 77q(a). Section 17(a) of the Securities Act "prohibits the offer as well as the sale of unregistered non-exempt securities." *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104.

*See also Pfohl v. Pelican Landing,* 567 F.Supp. 134, 138 (N.D.Ill.1983) (the Acts "extend to persons who offer to sell what they describe as securities, because the Acts reach fraud in the offer itself.")

The SEC is empowered to bring actions premised on the fraudulent offer of investment contracts involving Prime Bank schemes. Moreover, in a § 17(a) case, requiring the existence of multiple investors prior to finding a security would write out the element of an "offer" from the Securities Act and render that section a nullity. Thus, the conclusion that multiple investors must part with their money before a case predicated on the offer of an investment contract can be brought contradicts the very inclusion of the term "offer" in § 17(a).

■ In this case, the SEC has shown, and defendants have not contested, that fraud also occurred in the offer of a security. The SEC has shown that Lauer solicited prospective investors through a letter which he knew contained false and misleading information. Lauer admits making these false solicitations to increase the administrative fees paid to CCI. Similarly, Lauer participated in at least one meeting with prospective investors in the Konex Roll Program. Thus, the SEC has shown the existence of fraud by Lauer and CCI in the offer of a security as contemplated by § 17(a) of the Securities Act of 1933.

## CONCLUSION

We believe that the facts of this case fall within the parameters established by the Supreme Court in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). This is not a discretionary trading account or the purchase of a time share unit or other specific asset. In view of the dominant investment purpose and the obvious marketing of the scheme in a securities-like fashion, we believe that this is one of the "countless and variable schemes" intended to be covered by the federal securities laws. *See Howey,* 328 U.S. at 299, 66 S.Ct. at 1103. Given the principle that the federal securities laws are to be construed flexibly, not technically or restrictively, we find the requisite pooling and thus the existence of a security. *See*

**794**

*SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 199, 84 S.Ct. 275, 286–87, 11 L.Ed.2d 237 (1963).

Moreover, we believe that this action, as well as the numerous other actions filed by the SEC relating to the Prime Bank schemes, furthers the securities laws' broad remedial purpose and statutory policy of protecting public investors. *See Howey,* 328 U.S. at 301, 66 S.Ct. at 1104. "The fundamental purpose under the Securities Act is 'to eliminate serious abuses in a largely unregulated securities market.'" *Reves v. Ernst & Young,* 494 U.S. 56, 60, 110 S.Ct. 945, 949, 108 L.Ed.2d 47 (1990) (quoting *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975)). Nothing could be more fundamental to that purpose than the regulation of these instruments, which are marketed like securities and which have a dominant investment intent, which are sold throughout the United States and internationally and which have taken at least $57 million out of the United States capital markets.

There is currently no federal regulatory scheme specifically directed at purported Prime Bank Instruments. We believe that the absence of any other regulation and the broad remedial purpose of the federal securities laws require that a security be found such that the SEC and court can enjoin these fraudulent schemes. *See Reves,* 494 U.S. at 70–73, 110 S.Ct. at 953–55. When it created the federal securities laws, Congress could not have contemplated that regulators or the courts would stand by idly when there is no other regulation that oversees these fraudulent international investments which remove millions of dollars in investor funds from America's capital markets. To so hold, would render meaningless the purpose of our system of securities regulation.

For the foregoing reasons, the challenge of defendants John D. Lauer and Clifton Capital Investors L.P. to the jurisdiction of this court is denied.